Wesley TWOMBLY, et al., Plaintiffs,

v.

CITY OF FARGO, et al., Defendants.

No. A3–02–137.

United States District Court,
D. North Dakota,
Southeastern Division.

Sept. 29, 2005.

Margaret E. Moore Jackson, Clinical Education Program University of North Dakota School of Law, Laura L. Rovner, Legal Aid Association, Grand Forks, ND, for Plaintiffs.

Patricia A. Roscoe, Stacey Elizabeth Tjon, Solberg Stewart Miller Johnson Tjon Kennelly Ltd., Fargo, ND, for Defendants.

Memorandum Opinion Denying Plaintiffs' Motion for Summary Judgment and Granting Defendants' Motion for Summary Judgment

ERICKSON, District Judge.

Plaintiffs in the above titled matter have commenced this action seeking a declaration that a monument displaying the Ten Commandments, donated by a private organization, situated on public land owned by the Defendant City of Fargo, North Dakota, violates the Establishment Clause. Plaintiffs further seek an order of court directing that the monument be removed from the site where it has stood for over forty years.

The parties have submitted the case on stipulated facts and each party now seeks judgment in its favor on those facts. The Court is asked through competing cross motions for summary judgment to decide whether the monument displaying the Ten Commandments violates the Establishment Clause of the First Amendment to the United States Constitution.

### Summary of Decision

The Court finds that the Ten Commandments monument in question conveys a permissible dual message which celebrates both religious and secular ideals. In light of the most recent precedent of the United States Supreme Court, and the subsequent decision of the United States Court of Appeals for the Eighth Circuit in *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772 (8th Cir.2005), this Court holds that the monument does not violate the Establishment Clause.

## Background

The following facts are undisputed. The subject of the current motion is a monument donated to the City of Fargo by the Fraternal Order of Eagles ("Eagles") on March 8, 1958 to commemorate the city's recently completed urban renewal project. (Statement of Undisputed Facts ¶¶ 1, 2) (hereafter "Stmt. of Facts"). The Eagles are a non-religious civic organization. (Stmt. of Facts ¶ 2). The urban renewal project was an attempt to revitalize the downtown area of Fargo by demolishing some structures and building others. (Stmt. of Facts ¶ 3). Some of the new buildings constructed under this program included the Fargo Civic Auditorium, the current City Hall building and the mall located between them.

The monument itself stands six feet tall and three feet wide, and is tablet shaped. (Stmt. of Facts ¶ 23). On the face of the monument it reads:

the Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me

Thou shalt not make to thyself any graven images

Thou shalt not take the Name of the Lord thy God in vain

Remember the Sabbath day to keep it holy

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee

Thou shall not kill

Thou shalt not commit adultery

Thou shalt not steal

Thou shalt not bear false witness against thy neighbor

Thou shalt not covet thy neighbor's house

Thou shalt not covet thy neighbor's wife, nor his manservant nor his maidservant, nor his cattle nor anything that is thy neighbors

In an engraved scroll design at the bottom of the monument, in all capital letters, is inscribed:

PRESENTED TO THE
CITY OF FARGO

COMMEMORATING THE
FIRST URBAN

RENEWAL PROJECT IN
NORTH DAKOTA.

DEDICATED TO THE STATE'S
FUTURE

DEVELOPMENT AND A
BETTER WAY OF

LIFE FOR ALL ITS PEOPLE.

FARGO AERIE NO. 153

FRATERNAL ORDER OF EAGLES

1958

(Stmt. of Facts ¶ 23). The text of the monument is an amalgam of Jewish, Protestant, and Catholic versions of the Ten Commandments. (Stmt. of Facts ¶ 23). The Ten Commandments are derived from the Old Testament, Exodus 20:2–17, and Deuteronomy 5:6–21. (Stmt. of Facts ¶ 23). Above the text on the monument are two small tablets engraved with the Ten Commandments, written in Semitic script. (Stmt. of Facts ¶ 26). The monument also contains two Stars of David, which are traditionally recognized as symbolic of the Jewish faith. (Stmt. of Facts ¶¶ 25, 28). The Greek letters "Chi" and "Rho," read together as representing Jesus Christ, are also inscribed on the tablature. (Stmt. of Facts ¶¶ 25, 27). Other markings include an eagle grasping an American flag in its talons and an illuminated, "all-seeing eye," similar to the de-

sign found on one-dollar bills. (Stmt. of Facts ¶ 25).

The monument was presented to the City of Fargo by Judge E.J. Ruegemer, a St. Cloud, Minnesota District Judge and Chairman of the Eagles National Youth Commission, and the monument was accepted by the city by then-Mayor Herschel Lashkowitz. (Stmt. of Facts ¶ 4, 6). Other participants in the dedication service included two representatives of the Urban Renewal Agency from Chicago, two additional officers from the Fraternal Order of Eagles, four members of the clergy, members of the Fargo City Commission, and the director and members of the Fargo Urban Renewal Agency. (Stmt. of Facts ¶ 5). After accepting the monument from Judge Ruegemer, Mayor Lashkowitz stated that the tablature "shall this day forward occupy a place of honor ... and ultimately shall be placed on the premises of the new City Hall ... to be a constant reminder to one and all that Fargo shall go forward only as it respects and lives according to the principles of the Ten Commandments." (Stmt. of Facts ¶ 6).

Following the dedication of the monument, the city placed the display in storage. (Stmt. of Facts ¶ 7). The monument was later removed from storage and placed at its current location in 1961. (Stmt. of Facts ¶ 7). It was dedicated at its current location on June 4, 1961. (Stmt. of Facts ¶ 7). Present at this ceremony were Mayor Lashkowitz, Judge Ruegemer, two members of the clergy, and the former Grand Madam President of the Eagles Auxilliary. (Stmt. of Facts ¶ 8).

The monument currently stands in a grassy, open area mall. (Stmt. of Facts ¶ 9). In this location, the monument is bounded on its north by the Fargo Civic Auditorium, on the south by the Fargo Public Library, and on the east by Fargo City Hall. (Stmt. of Facts ¶ 10). Bordering the mall area on the west is 4th Street,

a two-way thoroughfare. (Stmt. of Facts ¶ 10). The display is located approximately 94 feet due south from the entrance of the Fargo Civic Auditorium, approximately 182 feet southwest of the entrance to Fargo City Hall, approximately 170 feet northwest from the north entrance of the Fargo Public Library, and about 103 feet east of 4th Street. (Stmt. of Facts ¶ 11). The mall area is dissected by five walkways, constructed with city funds, that extend from the monument to the Fargo Public Library, Fargo City Hall, the Fargo Civic Auditorium, and to the 4th Street crosswalk. (Stmt. of Facts ¶ 20, 22).

Since its placement on the current site in 1961, the city has held exclusive custody and control of the monument. (Stmt. of Facts ¶ 12). The City of Fargo has never specifically earmarked any funds for the care or maintenance of the display. (Stmt. of Facts ¶ 13). The mall area on which the monument stands is maintained by the city. (Stmt. of Facts ¶ 16). If the monument itself required maintenance, a city employee would provide whatever services were necessary. (Stmt. of Facts ¶ 14). In September 2001, an employee of the city did, in fact, clean off what appeared to be oil, from the monument. (Stmt. of Facts ¶ 15).

The City of Fargo allowed the monument to be placed following a request by the local chapter of the Eagles. (Stmt. of Facts ¶ 29). The mall area does not contain any other monuments other than the one at issue and other permanent markers cannot be placed in the mall without the approval of the city. (Stmt. of Facts ¶ 17, 18). No other organization has requested the permission to install or place a monument in the mall area. (Stmt. of Facts ¶ 19). The City has chosen to retain the monument in the mall area because it believes that the monument has historical significance. (Stmt. of Facts ¶ 29).

The Plaintiffs Wesley Twombly, Jon Lindgren, Davis Cope, Lewis Lubka, and William Treumann were residents of Fargo, North Dakota for all times relevant to this litigation. (Stmt. of Facts ¶ 31). They are all members of the "Red River Freethinkers," an organization "composed of members whose view of the supernatural is atheistic and agnostic." (Stmt. of Facts ¶ 32). All of the Plaintiffs utilize the structures in the mall area for one purpose or another, such as dealing with parking tickets, attending concerts or talks, or visiting the library. (Stmt. of Facts ¶ 33, 43, 50, 57, 62). During these visits to the mall, the Plaintiffs have come into unwanted contact with the Ten Commandments monument. (Stmt. of Facts ¶ 33, 43, 50, 57, 62). As a result of this unwanted contact the Plaintiffs have experienced feelings of exclusion, (Stmt. of Facts ¶ 34, 36, 37, 39, 47, 51, 52, 68), discomfort (Stmt. of Facts ¶ 45, 60), and anger (Stmt. of Facts ¶ 56, 61, 65). Plaintiff Treumann mentioned his objection to the monument to Mayor Lashkowitz roughly forty years ago, with the Mayor responding that the location of the monument was not a "big deal." (Stmt. of Facts ¶ 61). The Plaintiffs, absent Plaintiff Lindgren, brought their concerns to the city in August of 2001 and have attended various city meetings since that time urging for the monument's removal. (Stmt. of Facts ¶ 69). There is no evidence of any grievances concerning the monument between Plaintiff Truemann's objection 40 years ago and Plaintiffs' complaints in 2001. This suit follows.

## Analysis

It is, perhaps, no understatement to note at the outset of this discussion that the current state of Establishment Clause jurisprudence is both widely debated and criticized. The body of law as developed is convoluted, obscure, and incapable of succinct and compelling direct analysis. There currently exist numerous tests, with varying levels of applicability in various contexts, each of which stakes some claim of suitability to discern whether a government action is violative of the Establishment Clause. While recognizing the difficulties of Establishment Clause analysis, the United States Supreme Court has declared "we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." *Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). One widely discussed test employed in Establishment Clause litigation is the *Lemon* test. First articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2125, 29 L.Ed.2d 745 (1971), this test subjects the display in question to a three-prong analysis. Under *Lemon*, a law or state action is permissible only if: (1) it has a secular legislative purpose; (2) its primary or principal effect is neither to advance nor inhibit religion; and (3) it does not foster excessive government entanglement with religion. *ACLU v. City of Florissant*, 186 F.3d 1095, 1097 (8th Cir.1999).

The *Lemon* test is not, however, the only test that has been applied by the United States Supreme Court. Indeed, a review of the most recent Supreme Court opinions reflects an understanding of Establishment Clause jurisprudence in which a majority of the Supreme Court of the United States is of the opinion that there are cases in which the *Lemon* test should not be viewed by lower courts as universally applicable. Consistent with this analysis, this court believes that the case at bar is of the type in which the mechanical application of *Lemon* might yield a perverse and inconsistent result. While the Plaintiffs have consistently urged the application of the *Lemon* test to the facts applicable in the instant case, such an analysis would be contrary to the established precedent of the Supreme Court and, quite frankly, legally unsupportable.

In order to understand the reasons for this Court's opinion, it is necessary to review the most recent opinions of the Supreme Court and the context in which those cases arose. The Supreme Court's recent decision in *Van Orden v. Perry*, —— U.S. ——, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) is particularly instructive. In *Van Orden*, Chief Justice Rehnquist, writing for Justices Scalia, Thomas and Kennedy, with Justice Breyer concurring in the judgement, found that a Ten Commandments tablature standing on the grounds of the Texas State Capitol did not violate the Establishment Clause. In reaching the Court's decision, Chief Justice Rehnquist observed that the factors identified in *Lemon* were declared to be "no more than helpful signposts" just two years after *Lemon* was decided. *Van Orden*, 125 S.Ct. at 2861 (quoting *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973)). The Chief Justice further noted that in recent Establishment Clause decisions the Court simply did not apply the *Lemon* test. See, e.g., *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). Most importantly, however, Chief Justice Rehnquist observed that the *Lemon* test was not particularly illuminating in cases dealing with displays like the one at issue in this case. The Chief Justice noted in *Van Orden* that the *Lemon* test was "not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds." *Van Orden*, 125 S.Ct. at 2861. Chief Justice Rehnquist distinguished the Texas monument from other, less passive, Ten Commandments displays that were subject to the *Lemon* test. Illustrative of this point is *Stone v. Graham.* The Chief Justice opined that the facts in *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), stood in particularly sharp contrast to the circumstances present in *Van Orden*. *Van Orden*, 125 S.Ct. at 2861. In *Stone*, a Kentucky statute required the posting of the decalogue in every public schoolroom. *Stone*, 449 U.S. at 39, 101 S.Ct. 192. The Chief Justice observed that the display in *Stone* necessarily "confronted the students every day" while, in contrast, the Petitioner, Thomas Van Orden, was free to ignore the tablature and in fact had walked past it for years before bringing the suit. *Van Orden*, 125 S.Ct. at 2864. Cf. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (Court noting that offensive words on jacket are constitutionally protected as people are free to look away). As Chief Justice Rehnquist analyzed the holding in *Stone*, he noted that since *Stone* relied near exclusively on school prayer cases it was fairly transparent that the *Stone* Court was particularly sensitive to the fact that the Court has previously "been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Van Orden*, 125 S.Ct. at 2864 (citing *Edwards v. Aguillard*, 482 U.S. 578, 583–84, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)). The Chief Justice further noted, "[n]either *Stone* itself nor subsequent opinions have indicated that *Stone's* holding would extend to ... capitol grounds." *Van Orden*, 125 S.Ct. at 2854.

Based, at least in part, on this analysis, the Chief Justice declined to apply the *Lemon* test, finding that an analysis of the "nature of the monument and ... our Nation's history" served as a stronger and more rationally applicable guide. Id. at 2854. Turning to the history of the Republic, Chief Justice Rehnquist described the long and "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life...." Id. at 2861 (citing *Lynch*, 465 U.S. at 674, 104 S.Ct. 1355). Chief Justice Rehnquist also described

how the Court's own decisions had reflected the role of God in the Nation's history. See *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 26, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (Rehnquist, C.J., concurring in the judgment) ("Examples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history abound."); id. at 35–36, 124 S.Ct. 2301 (O'Connor, J., concurring in the judgment) ("It is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mottoes and oaths."); *Lynch,* 465 U.S. at 675, 104 S.Ct. 1355 ("Our history is replete with official references to the value of the invocation of Divine guidance."); *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 213, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) ("It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people...."); *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952) ("[w]e are a religious people whose institutions presupposes a Supreme Being.").

The Ten Commandments, in particular, are featured on many of our Nation's most prominent and storied buildings, such as the Library of Congress, the National Archives, the United States House of Representatives, the Department of Justice and even inside the courtroom of the United States Supreme Court. *ACLU Nebraska Foundation v. City of Plattsmouth,* 419 F.3d 772, 777 (8th Cir.2005) (citing *Van Orden,* 125 S.Ct. at 2862–63 n. 9). Within the Supreme Court building itself are found many references to the Commandments, including a depiction of the Ten Commandments decorating the gates of the courtroom and a frieze depicting Moses carrying tablets that bear the Ten Commandments. *Plattsmouth,* 419 F.3d at 777 (citing *Van Orden,* 125 S.Ct. at 2862). The Court found that the undeniable religious message of the Commandments was, in light of our national traditions, coupled with a historical message, which gave the Van Orden display a "dual significance," and that the "dual significance" provided a context that rendered the display valid under the Establishment Clause. *Van Orden,* 125 S.Ct. at 2864.

The recent decision of the Eighth Circuit in *Plattsmouth* also dealt with an Establishment Clause challenge to a freestanding Ten Commandments display. *Plattsmouth,* 419 F.3d at 777. There, the Eighth Circuit, citing *Van Orden,* likewise found that the Ten Commandments monument, virtually identical to the one challenged here, was "passive" in nature. Id. at 776–777. "Like the Ten Commandments monument at issue in *Van Orden,* the Plattsmouth monument makes passive—and permissible—use of the text of Ten Commandments to acknowledge the role of religion in our Nation's heritage." Id. at 777; see also *Anderson v. Salt Lake City Corp.,* 475 F.2d 29, 34 (10th Cir.1972) (In upholding display, court describes Eagles Ten Commandments monument as "passive"). As such, the Eighth Circuit in *Plattsmouth* similarly refrained from applying the *Lemon* test, and instead focused on the Chief Justice's historical analysis used in *Van Orden* and also examined some of the contextual factors urged by Justice Breyer in his *Van Orden* concurrence. Id. at 778.

In *Van Orden,* Justice Breyer noted that no test could adequately stand as a surrogate for the "exercise of legal judgment." *Van Orden* 125 S.Ct. at 2869 (Breyer, J., concurring in judgment). Instead, he stressed the need to examine how the text of the challenged display is used, which, in turn, necessitates a contextual inquiry. Id. As applied in *Van Orden,* this contextual analysis addressed the "circumstances surrounding the display on the capitol grounds" and the "physical setting" of the

monument. Id. at 2870. The Ten Commandment display at issue in *Van Orden* was placed on the 22 acre Texas State Capitol grounds among 17 monuments and 21 historical markers that celebrated the "people, ideals, and events that compose Texan identity." Id. at 2558 (citing Tex. H. Con. Res. 38, 77th Leg. (2001)). Justice Breyer noted that despite the undoubtably religious nature of the Ten Commandments display, the presence of numerous other secular monuments served to transform the tablature into a broader, singular, "illustrative message reflecting the historical 'ideals' of Texans...." Id. at 2870.

In *Plattsmouth*, the Ten Commandments monument was situated in a 45 acre park area, known as Memorial Park. *Plattsmouth*, 419 F.3d at 774. This park is located ten blocks from *Plattsmouth* City Hall. Id. The monument contains an inscribed scroll, common to other tablatures donated by the Fraternal Order of Eagles, that reads: "PRESENTED TO THE CITY OF PLATTSMOUTH, NEBRASKA BY FRATERNAL ORDER OF EAGLES PLATTSMOUTH AERIE NO. 365 1965." Id. at 773. In addition to the monument, the park contained bar-b-que grills, picnic tables, benches, shelters, and a baseball diamond. Id. at 774. Some of these tables and benches have affixed plaques inscribed with the names of donors. Id. There is also a large plaque engraved with the names of all donors to the park. Id. Memorial Park does not, however, contain any sort of other, secular historical displays, like the ones in *Van Orden*. Id. Nevertheless, the Eighth Circuit found that the monument did not violate the Establishment Clause, instead

finding that the tablature stood as a "passive acknowledgment of the roles of God and religion in our nation's history" similar to the display in *Van Orden*. Id. at 778. The court also viewed the 10–block distance between the monument and Plattsmouth City Hall, as opposed to the fifty yards distance between the tablature and Texas State Capitol in *Van Orden*, as providing "further support for our conclusion that *Van Orden* effectively protects the Plattsmouth monument from successful attack under the Establishment Clause." Id. at 777 n. 7.

The "passive monuments" at issue in both *Van Orden* and *Plattsmouth* are Ten Commandments tablatures that are virtually identical to the display challenged here. All three displays were donated by the Fraternal Order of Eagles and have roughly the same physical dimensions. *Van Orden*, 125 S.Ct. at 2858; *Plattsmouth*, 419 F.3d at 773–774. They also all possess the same iconic designs such as the illuminated all-seeing eye, the eagle grasping the American flag, the Greek letters "Chi" and "Rho," the Star of David, and, of course, the Ten Commandments. *Van Orden*, 125 S.Ct. at 2858; *Plattsmouth*, 419 F.3d at 773–774. The only difference among the three monuments is their date of erection and their respective inscribed dedications. Because of the monuments similitude, indeed, they are nearly uniform in appearance and character, this Court finds that the *Lemon* test, unused in *Van Orden* and *Plattsmouth*, is likewise inapplicable in properly determining the constitutionality of the Fargo Ten Commandments display.[1]

---

1. This Court also observes that *Books v. City of Elkhart, Indiana*, 235 F.3d 292 (7th Cir. 2000) involved an Establishment Clause challenge to a Fraternal Order of Eagles Ten Commandments display. There, the Seventh Circuit, applying the *Lemon* test, found the display to be unconstitutional. This Court, however, does not find this case to be instructive in light of the more recent Supreme Court precedent handed down in *Van Orden* as well as the more recent opinion of this Court's own circuit in *Plattsmouth*.

In Justice Breyer's *Van Orden* concurrence, he observed that the Ten Commandments display at the Texas State Capitol, like the one at issue here, was privately funded and the monument had an inscription which prominently displayed to the public that the monument was donated by the Fraternal Order of Eagles. *Van Orden*, 125 S.Ct. at 2870 (Breyer, J., concurring in judgment). On the *Van Orden* tablature, inscribed just below the Ten Commandments is the language:

PRESENTED TO THE

PEOPLE AND YOUTH OF TEXAS

BY THE

FRATERNAL ORDER OF EAGLES

OF TEXAS

1961

Id. Justice Breyer suggested that this inscription served to distance the State from the religious aspect of the monument's message, although noted such a disclaimer would not automatically immunize a religious display. Id. Justice Breyer's observation, however, implicates the perceptions of the viewing public. The fact that an inscription exists evincing private sponsorship serves to weigh against the probability that the religious message will be attributed to the state. He makes a similar observation that the absence of complaints about the Texas monument over the span of 40 years likewise demonstrates the lack of a discernable message of governmental favoritism. Id. at 2870. In short, this Court perceives the context driven inquiry used by Justice Breyer in *Van Orden* as necessitating an inquiry into whether a reasonable observer would perceive governmental endorsement of the religious message. "The effect of the display depends on the message that the government's practice communicates: the question is 'what viewers may fairly understand to be the purpose of the display.' That inquiry, of necessity, turns upon the context in which the contested object appears." *County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (citing *Lynch,* 465 U.S. at 692, 104 S.Ct. 1355). "Every government practice must be judged in its unique circumstances to determine whether it [endorses] religion." *Lynch,* 465 U.S. at 694, 104 S.Ct. 1355 (O'Connor, J., concurring).

Justice Breyer's note of the Texas display's acknowledgment of its private origin presumably makes it more likely that the speech will not be attributed to the government and therefore cannot convey a message that the state deems a non-adherent a political or social outsider. Religious or political speech that is recognized to be private in character, cannot, constitutionally, be considered to have an effect of relegating a member of society to the status of undesirable class. In order for an aggrieved plaintiff to receive relief, "an Establishment Clause violation must be moored in governmental action." *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 779, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Religious speech or displays that are recognized as wholly private in character simply creates no stigma, constitutionally speaking. The Court has recognized that there is "a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion which the Free Speech and Free Exercise Clauses protect." Id. at 765–766 (citing *Bd. of Ed. of Westside Cmty. Sch. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)) (emphasis in original).

The Fargo display, while physically similar to the monuments in *Van Orden* and *Plattsmouth,* is neither far removed from

governmental buildings, nor is it surrounded by a collection of secular monuments. However, given the necessity to analyze the Fargo monument in a holistic context, and in light of the decisions in *Van Orden* and *Plattsmouth*, this Court cannot conclude that the absence of the characteristics found to be persuasive in *Van Orden* and *Plattsmouth* would render the display immediately violative of the Establishment Clause. In addressing the monument's proximity to governmental structures, an examination of Establishment Clause jurisprudence shows that this factor is not by itself dispositive. *Van Orden*, 125 S.Ct. 2854; *Lynch*, 465 U.S. 668, 104 S.Ct. 1355 *Allegheny*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *Freethought Soc'y of Greater Philadelphia v. Chester County*, 334 F.3d 247 (3d Cir.2003). Nor must a display on public land that is adjudged to have a religious message be surrounded by secular messages in order to escape constitutional infirmity. *Capitol Square*, 515 U.S. 753, 115 S.Ct. 2440; *Plattsmouth*, 419 F.3d 772; *Freethought Society*, 334 F.3d 247; *Anderson*, 475 F.2d 29. Therefore, the presence of secular monuments, as in *Van Orden*, or the display being sufficient distance from the governmental seat of power, as in *Plattsmouth*, are not necessary ingredients for a finding of constitutionality, but are rather factors in determining whether, in the aggregate, a monument's religious message is attributable to the state.

Further, while the Texas State Capitol tablature states that it was a creation of private, not public, monies, it contains no statement as to the reasons, secular or otherwise, for its donation. Without more, the public is left to assume that the State of Texas possessed a solely religious motivation in accepting the tablature and allowing its erection on State Capitol grounds. The inclusion of surrounding secular monuments, however, as described above, served to weave this overt religious message into one that generally described the rich history and ideals of the Texas people. *Van Orden*, 125 S.Ct. at 2869–70. In *Plattsmouth*, an inscription bearing a secular purpose was similarly lacking, but the Eighth Circuit nevertheless found no Establishment Clause violation in light of the historical impact of the Commandments on Nebraska life, as well as the physical distance of the tablature from City Hall. *Plattsmouth*, 419 F.3d at 777–778. The inscription on the Fargo display, however, describes not only the origin of the monument's creation, but also a message from the Eagles describing the purpose of the display. In commemorating the successful completion of North Dakota's first urban renewal project, and dedicating the monument to the state's future development and a better way of life, the monument sends a clear secular message concurrent with the obvious religious one. The display in Fargo requires no contextual substitute for a secular message, as one is inscribed across the very face of the monument.

This court must also examine the physical location of the Fargo display. As stated above, the physical locale is partially determinative is assessing whether a reasonable observer would perceive a religious message as emanating from the state or from a private party. A public forum is an area or facility that has been, by long tradition, utilized for the free exchange of ideas. *Boos v. Barry*, 485 U.S. 312, 317, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). Parks, along with city streets and sidewalks, have been recognized as traditional public fora. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and . . . for the purposes of assembly, communicating thoughts between citizens and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). By contrast, speech that occurs in non-public fora, such

as inside of a courthouse, are not likely to be seen as private speech, but rather as the opinion of the state. Because private speech is regularly excluded from such places, it stands to reason that religious speech that occurs in such places is more likely to be viewed as the government expressing a subjective religious preference. See *McCreary County v. ACLU of Ky.*, —— U.S. ——, 125 S.Ct. 2722, 2732 n. 8, 162 L.Ed.2d 729 (2005) (citing *ACLU of Ky. v. McCreary County*, 354 F.3d 438, 458–59 (6th Cir.2003)) (noting the courthouse location of the display would contribute to a reasonable observer perceiving the government as endorsing religion); *Capitol Square*, 515 U.S. at 764, 115 S.Ct. 2440 ("easily" distinguishing between a permissible cross displayed by a private party in a city park, and an illegitimate private creche on display in Allegheny County on the grounds that the Allegheny courthouse staircase was not traditionally open to private speech).

In the present case, the tablature is located in a grassy mall area that is surrounded by the Fargo Civic Auditorium, Fargo Public Library, and Fargo City Hall. Plaintiff Lindgren, who was Mayor of Fargo for 16 years, recalled several occasions where the park was used for political assembly, public advocacy, memorial services, and religious worship. (Stmt. of Facts ¶ 53, 54, and 55).[2] Plaintiff Cope recalls attending the Fargo Blues Festival, which was held on the mall. (Stmt. of Facts ¶ 43). Based partially on these recollections and the physical character of the mall itself, this Court is convinced that the public would perceive the mall as a public forum. The religious opinions expressed in this locale, as opposed to speech that would occur inside of, say, a courthouse, is less likely to be seen as the exclusive dominion of the state. In fact, to exclude the request of a private organization, such as the Fraternal Order of Eagles, to engage in religious speech in a recognized forum on the sole grounds that their speech has religious content could arguably be a violation of their constitutional rights. See *Good News Club*, 533 U.S. 98, 121 S.Ct. 2093 (finding unconstitutional a public school's policy of restricting religious student group from use of school facilities); *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (declaring a public university's policy of withholding funding for a religious publication to be unconstitutional); *Capitol Square*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (city did not violate Establishment Clause by allowing private party to display unattended cross on public grounds); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (finding constitutional violation when school refused church use of rooms available to public solely on basis of church's desire to engage in religious instruction); *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (constitutional violation when school denied religious student group use of university facilities that were open to other student groups).

Whether a reasonable observer of the Fargo display is imbued solely with knowledge of the monument gleaned from his own observation or whether he possesses an awareness of the "history and context of the community and forum" in which the display appears, *Capitol Square*, 515 U.S.

---

2. The Court notes that these incidents of political assembly were mentioned by Plaintiff only as a mere backdrop to assert other factual points. This Court believes it is highly probable that there exists other instances of the mall being used for political assembly, both during the mayoralty of Plaintiff Lindgren as well as before or after his term in office.

at 780, 115 S.Ct. 2440 (O'Connor, J., concurring), this Court is convinced the result is the same. If the former observer views the monument he would quickly realize that the display originated from a private organization and was erected for a secular purpose, to celebrate the first urban renewal project in North Dakota history. However, if the observer is imbued with the full knowledge of the history of the display and of the land on which its sits, this Court concludes that he or she would be even more conscious of the secular nature of the monument. While the comments of Fargo Mayor Herschel Lashkowitz during the Fargo's tablature initial 1958 dedication demonstrate an awareness of the obvious religious aspects of the Ten Commandments display, this message must be analyzed in its full context, the sum of which evidences a clear secular purpose. This secular purpose is to celebrate the successful completion of North Dakota's first urban renewal project. The reasonable observer would know that the mall area and most of the civic buildings that surround the monument were constructed during this renewal project. (Stmt. of Facts ¶ 3). Further, this observer would also be cognizant of the fact that the park in which the monument has been used in the past for public demonstrations, gatherings or memorials. (Stmt. of Facts ¶ 53, 54, and 55).

Another contextual factor that Justice Breyer weighed in favor of the *Van Orden* display was the number of years it had stood without controversy. Specifically, the monument had stood for forty years without legal challenge. *Van Orden*, 125 S.Ct. at 2870 (Breyer, J., concurring in judgment). "[T]hose 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular

religious sect, [or] to promote religion over nonreligion...." Id. Likewise, the Ten Commandments tablature in Fargo, which predates both the *Van Orden* and *Plattsmouth* monuments, has never previously been the subject of legal challenge. Nonlegal complaints about the monument have been similarly rare. In fact, since the tablature's dedication 47 years prior, there is evidence of only one complaint. This grievance, conveyed verbally to Mayor Lashkowitz by Plaintiff Truemann, was aired over forty years ago. (Stmt. of Facts ¶ 61). Based on the extreme dearth of community complaints and the complete absence of legal challenges over the monuments near fifty year history, this Court is convinced that a reasonable observer could not perceive the city as adopting or endorsing the religious message of the display. Without religious speech that is publicly recognized as emanating from the government, no relief can be afforded the plaintiffs. "[T]he endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from the discomfort of viewing symbols of a faith to which they do not subscribe." *Capitol Square*, 515 U.S. at 779, 115 S.Ct. 2440 (O'Connor, J., concurring). For the court to do otherwise would be to excessively cater to one private viewpoint at the expense of another, in essence inflicting the same injury the Court is now asked to remedy.

## Conclusion

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

IT IS SO ORDERED.