**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESSE CARD,

*Plaintiff-Appellant,*

v.

CITY OF EVERETT; RAY STEPHANSON,
in his official capacity as Mayor
of Everett, Washington,

*Defendants-Appellees.*

No. 05-35996

D.C. No.
CV-03-02385-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
July 11, 2007—Seattle, Washington

Filed March 26, 2008

Before: Arthur L. Alarcón, Ferdinand F. Fernandez, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge Fernandez

3011

## COUNSEL

Marc D. Slonim of Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, for the plaintiff-appellant.

David H. Remes and Benjamin C. Block of Covington & Burling, Washington, D.C., for the plaintiff-appellant.

Ayesha Khan of Americans United for Separation of Church and State, Washington, D.C., for the plaintiff-appellant.

Stephen A. Smith, Frederic C. Tausend, and Michael K. Ryan of Kirkpatrick & Lockhart Preston Gates Ellis LLP, Seattle, Washington, for the defendants-appellees.

Stephen W. Fitschen of The National Legal Foundation, Virginia Beach, Virginia, amicus curiae in support of the defendants-appellees.

## OPINION

WARDLAW, Circuit Judge:

Jesse Card appeals the district court's award of summary judgment to the City of Everett on his claim that the City's display of a six-foot tall granite monument inscribed with the Ten Commandments on the grounds of the Everett Old City Hall violates the Establishment Clauses of the Constitutions of the United States and the State of Washington. In 2005, the Supreme Court issued decisions in *Van Orden v. Perry*, 545

U.S. 677 (2005) and *McCreary County v. ACLU*, 545 U.S. 844 (2005), both of which addressed the issues presented here, and the former of which involved a monument of virtually identical design and origin to the monument at issue here. The Court concluded that the display on the grounds of the Texas State Capitol in *Van Orden* is constitutional, but struck down as unconstitutional the Kentucky monument display at issue in *McCreary*. Although the circumstances of the Ten Commandments' installation in the City of Everett vary slightly from those surrounding the Texas monument, we must agree with the district court that *Van Orden*, particularly Justice Breyer's concurring—and determinative—analysis, controls the decision here. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I.  BACKGROUND

### A.  The Everett Monument

The monument at the heart of this dispute[1] was donated to the City of Everett in 1959 by the local aerie (chapter) of the Fraternal Order of Eagles, a national civic organization. It sits adjacent to Old City Hall on public land under the City's control. The Old City Hall building itself now houses only the police department. The monument, which is located along a sidewalk about forty feet north of the entrance to the building, is constructed of granite and stands about six feet tall. Its main feature is an inscription of a non-sectarian version of the Ten Commandments:

> the Ten Commandments
> I AM the LORD thy God
> Thou shalt have no other gods before me.
> Thou shalt not make to thyself any graven images.
> Thou shalt not take the Name of the Lord thy God

---

[1]*See* Appendix A, *infra*.

in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

The monument's design resembles two adjoined tablets with rounded tops. The upper portion of each larger tablet has a floral motif circling a smaller tablet bearing what appear to be ancient Phoenician characters. The all-seeing Eye of Providence is centered at the point where the two large tablets join; an eagle and United States flag lie directly below. Centered under the text of the Ten Commandments is a labarum[2] flanked by Stars of David. Finally, prominently carved at the base of the monument is the following dedication: "PRESENTED TO THE CITY OF EVERETT BY EVERETT AERIE NO. 13 FRATERNAL ORDER OF EAGLES DECEMBER, 1959."

The monument stood in a more conspicuous location at the corner of the Old City Hall building until 1988, when it was relocated approximately ten feet away to create space for a war memorial. The war memorial consists of three eight-foot

---

[2]The labarum is "[t]he imperial standard of the later Roman emperors . . . [especially] that adopted by Constantine after his conversion to Christianity," which consists of "a monogram of the first two letters (XP) of the name of Christ in Greek form." Webster's New International Dictionary 1378 (2d ed. 1934).

tall black granite towers inscribed with the names of City residents who died in military service. Across the street, on Snohomish County property, there are several other monuments, including a September 11 memorial, a Medal of Honor memorial, a county war memorial, an Armed Forces monument and a monument to the common worker. Old City Hall also bears a plaque commemorating the rededication of the building in 1979.[3]

The events surrounding the conveyance of the monument from the Eagles to the City are clouded by the passage of time. Few contemporaneous records exist. The minutes of an October 29, 1959 Everett City Council meeting are the only relevant legislative record: "Moved by Johnson, seconded by Gebert to accept a six-foot high Granite Monolith of the Ten Commandments from the Everett Aerie No. 13, Fraternal Order of the Eagles." More details about the dedication of the monument are found in two articles published in the Everett Daily Herald newspaper. The first article, published on Thursday, December 17, 1959, reports that the Everett aerie had completed preparations for presentation of the monument to the City on the following Saturday. The article notes that "Judge Lawrence Leahy of Wenatchee, past grand president of the Eagles [would be] making the principal address." An invocation and benediction were to be performed, and several religious leaders were to give remarks. A follow-up article on Monday, December 21, indicated that "[a] granite monolith bearing the Ten Commandments was unveiled on the front lawn of city hall Saturday as local dignitaries, church leaders and Eagles representatives looked on," and that "Mayor George Culmback accepted the monolith on behalf of the citizens of Everett."

The monument's relocation twenty-nine years later was

---

[3]The Old City Hall building was added to the National Register of Historic Places in 1990. No surrounding monuments were included as part of the City's application to list Old City Hall in the Register."

unaccompanied by any fanfare. In its current location, the monument is shrouded by shrubberies and obscured from view unless one is standing close by. In 1990, the City received its first letter challenging the constitutionality of the monument's display. The City took the position that the Establishment Clause did not require it to remove the monument. The record contains a total of seven such letters delivered during the 1990s, five written by two citizens and two letters written by the Americans United for Separation of Church and State. In each instance, the City responded by reiterating its view that the Establishment Clause did not bar the display of the Ten Commandments monument.

## B. Judge Ruegemer, Cecil B. DeMille, and the Eagles

The Everett monument and over a hundred others were produced by the Eagles in Minnesota and distributed by local aeries. Distribution of the monuments was the brainchild of Minnesota Judge E.J. Ruegemer, a leader on the Eagles' Youth Guidance Committee.[4] A primary goal of that committee was to "design a well-defined and simple program that would provide youngsters with a common set of values and a common code of conduct." Ruegemer's service in the juvenile courts between 1941 and 1947 led him to believe that "if troubled youths were exposed to one of mankind's earliest and long-lasting codes of conduct, those youths might be less inclined to break the law." He developed a plan to distribute

---

[4]Ruegemer submitted an affidavit to the district court. Much of this history is derived from his explanation of the genesis of the Ten Commandments project. The source of the Supreme Court's history of the project in *Van Orden* appears to be based on this or a very similar declaration. *See Books v. City of Elkhart*, 235 F.3d 292, 294-95 (7th Cir. 2000); *State v. Freedom from Religion Found., Inc.*, 898 P.2d 1013, 1017 (Colo. 1995). The plaintiff in *Van Orden* presented to the district court no independent evidence of the Eagles' project, instead stipulating that the history described in *Books* and *Freedom of Religion* was accurate for his purposes. *Van Orden v. Perry*, No. 01-833 (W.D. Tex. Aug. 9, 2002) (Plaintiff's Trial Brief) (Docket No. 52).

copies of the Ten Commandments for posting in juvenile courtrooms nationwide, and approached the Eagles with his plan. Ruegemer claimed that "[a]t first, the Eagles were reluctant to fund the program because they were worried that the program might seem sectarian."

To allay these concerns, Ruegemer convened a committee of "fellow judges, lawyers, various city officials and clergy of several faiths from the St. Cloud area," and "developed a version of the Ten Commandments which was not identifiable to any particular religious group." The Eagles signed on to promote Ruegemer's plan of distributing copies of this credo. The plan germinated for some years, taking a turn for the grandiose when Hollywood showman Cecil B. DeMille became involved. He and Ruegemer decided that instead of paper copies of the Ten Commandments, they would distribute granite monoliths. Ruegemer and his committee designed the monuments, by which, he avers, they "intended . . . to set forth a code of conduct, not an endorsement of any or one particular religion at all." The monuments were produced by two Minnesota granite companies. Local aeries interested in participating in the Ten Commandments project would raise the money to pay for a monument, then present it to their local community as a gift. Ruegemer estimates that between 140 and 150 monuments were distributed. The total number of monuments donated by aeries across the country is higher, however, because some aeries commissioned locally constructed versions modeled after those produced in Minnesota.

## II.  STANDARD OF REVIEW

"We review the grant of summary judgment de novo." *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). "We must determine, viewing the evidence in the light most favorable to [Card], the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

### III. DISCUSSION

### A. The Supreme Court's Establishment Clause Jurisprudence

[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[5] U.S. Const. amend. I. In 1971, the Supreme Court issued *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which established the three-part test that has served as the guiding principle for assessing Establishment Clause violations ever since. To satisfy the *Lemon* test for constitutionality of a public sanctioning of religious activity, the government conduct at issue: (1) "must have a secular . . . purpose"; (2) "its principal or primary effect must be one that neither advances nor inhibits religion"; and (3) it "must not foster 'an excessive government entanglement with religion.' " *Id.* at 612-13 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)). As recently as 2005, the Supreme Court reaffirmed the vitality of the *Lemon* test. *See McCreary*, 545 U.S. at 859-66; *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1042 (9th Cir. 2007) ("The *Lemon* test remains the benchmark to gauge whether a particular government activity violates the Establishment Clause."); *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1054-56 (9th Cir. 2007).

---

[5]Card also alleges that the monument violates Article I, Section 11 of the Washington State Constitution, which states that "[n]o public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . . ."

However, because we conclude that the City's display of the monument was not motivated by a religious purpose, *infra* at 2714-15, its display does not violate Article I, Section 11 of the Washington State Constitution. *See Malyon v. Pierce County*, 935 P.2d 1272, 1282 (Wash. 1997) ("[T]he appropriation of money, or application of property, to effectuate any objective other than worship, exercise, instruction, or religious establishment is not within the [Article I, Section 11] prohibition.").

The *Lemon* test has not escaped unscathed, however. *See McCreary*, 545 U.S. at 890 (Scalia, J., dissenting) (collecting criticism of *Lemon* by various members of the Court). One notable case decided after *Lemon* is *Marsh v. Chambers*, 463 U.S. 783 (1983).[6] In that case, the Eighth Circuit applied the *Lemon* test to find unconstitutional the Nebraska Legislature's employment of a chaplain and the opening of each legislative session with a prayer. *Id.* at 785-86. The Supreme Court reversed, eschewing the *Lemon* test, instead looking to the "unique history" of prayer at the opening of Congress dating back to the Continental Congress and "accept[ing] the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that . . . challenged." *Id.* at 791. As Justice Brennan pointed out in dissent, *Marsh* is a narrow opinion that should be construed as carving out an exception to normal Establishment Clause jurisprudence due to the "unique history" of legislative prayer. *Id.* at 795-96 (Brennan, J., dissenting).[7]

The Court has also eschewed the *Lemon* test in the context of coercive religious activity in public schools, where "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). In *Lee*, which addressed mandatory religious speech at graduation, the Court also did not apply the *Lemon* test, instead holding that "[t]he government involvement with religious activity in this case is pervasive, to the point of creating a state-sponsored and state-directed religious exercise in a public school." *Id.* at 587; *see also Sch.*

---

[6]In his concurrence in *Lee v. Weisman*, 505 U.S. 577 (1992), Justice Blackmun asserted that in thirty-one Establishment Clause cases decided since 1971, the Court had applied *Lemon* in all cases except *Marsh*. *Id.* at 603 n.4.

[7]The Court also decided *Larson v. Valente*, 456 U.S. 228 (1982), without applying the *Lemon* test. *Id.* at 252 (stating that the *Lemon* test applied to "laws affording a uniform benefit to *all* religions, and not . . . provisions . . . that discriminate *among* religions").

*Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222-27 (1963) (holding that laws requiring that bible verses be read at the start of the day in public schools violated the Establishment Clause).[8]

[2] Even when applying *Lemon*, the Court has on occasion tailored the test to the particular facts before it. In *Agostini v. Felton*, 521 U.S. 203, 208-09 (1997), the Court upheld a statute authorizing Title I funds to be distributed to children attending parochial schools. Justice O'Connor reworked the *Lemon* test by "folding the 'excessive entanglement' inquiry into, and setting out revised criteria for, the 'effect' prong." *Cmty. House*, 490 F.3d at 1055. Thus, under the revised *Lemon-Agostini* inquiry, we look to governmental purpose; and, in order to evaluate the effect of the activity, "(i) whether governmental aid results in government indoctrination; (ii) whether recipients of the aid are defined by reference to religion; and (iii) whether the aid creates excessive government entanglement with religion." *Id.*

Despite straying from *Lemon* in narrow situations, the Court has consistently applied the *Lemon* test to religious dis-

---

[8]The district court in *Lee* applied the *Lemon* test to hold that, because the mandatory religious speech had the effect of endorsing religion, it violated the Establishment Clause. *Lee*, 505 U.S. at 584-85. The First Circuit affirmed. *Id.* In spite of the petitioners' urging, the Supreme Court declined to revisit its *Lemon* jurisprudence, noting that "[w]e can decide the case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured." *Id.* at 587. The Court went on to hold that the religious activity in *Lee* was so "pervasive" that it had to violate the Establishment Clause. *Id.*

In so holding, the Court did not repudiate *Lemon*. Indeed, it recognized *Lemon* as the "general constitutional framework" that applies in this area. Instead, the Court held that some religious activities, particularly those that are coercive in the educational setting, are so plainly violative of the Establishment Clause that they need not be analyzed under any test at all. It follows that, had the Court applied the *Lemon* test, it certainly would have agreed with the district court and the First Circuit that the mandatory religious speech failed under the *Lemon* test as well.

play cases. In *Lynch v. Donnelly*, 465 U.S. 668 (1984), the Court applied the *Lemon* test to find constitutional a city Christmas display in Pawtucket, Rhode Island. The display included an assortment of traditional Christmas holiday season figures and decorations. It also included a city-owned "crèche, which has been included in the display for 40 or more years, [and] consists of the traditional figures, including the Infant Jesus, Mary and Joseph, angels, shepherds, kings, and animals, all ranging in height from 5 [inches] to 5 [feet]." *Id.* at 671. Applying the *Lemon* test, the Court noted that the city needed to have "a secular purpose for its display," but that the city's objectives need not be "exclusively secular." *Id.* at 681 n.6. The Court opined:

> It would be ironic . . . if the inclusion of a single symbol of a particular historic religious event, as part of a celebration acknowledged in the Western World for 20 centuries, and in this country by the people, by the Executive Branch, by the Congress, and the courts for two centuries, would so "taint" the City's exhibit as to render it violative of the Establishment Clause.

*Id.* at 686.

In *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), the Court found unconstitutional a Kentucky law that required the posting of privately funded copies of the Ten Commandments in every public classroom in Kentucky. *Id.* at 39-40. The law required that each copy of the Decalogue bear a small notation that "[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41 (internal quotation marks omitted). Applying the *Lemon* test, the Court found that the statute had no secular purpose, that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legisla-

tive recitation of a supposed secular purpose can blind us to that fact." *Id.*

Although *Stone* falls within the public school coercive religious exercise cases routinely found to violate the Establishment Clause, it also stands for the narrower proposition that government displays of the Ten Commandments can never satisfy the *Lemon* Test. The Court reasoned:

> The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. See Exodus 20: 12-17; Deuteronomy 5: 16-21. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. See Exodus 20: 1-11; Deuteronomy 5: 6-15.

*Id.* at 41-42 (footnote omitted). The *Stone* Court further rejected the notion that this presented a case "where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like," emphasizing that

> [p]osting of religious texts on the wall serves no such educational function. If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter

of private devotion, it is not a permissible state objective under the Establishment Clause.

*Id.* at 42. The clear import of the *Stone* Court's rationale is that posting such an inherently religious document can never have a secular purpose, and thus can never satisfy the *Lemon* test.

## B.   Recent Developments in Ten Commandments Law

Fast-forward twenty-five years to the year 2005, when the Court again struggled with the *Lemon* test as applied to governmental displays on public property of the inherently religious and definitively non-secular Ten Commandments. *See Van Orden*, 545 U.S. at 704-05 (Breyer, J., concurring in the judgment) (holding the Texas display constitutional); *McCreary*, 545 U.S. at 858 (holding the Kentucky display unconstitutional). Confounded by the ten individual opinions in the two cases, and perhaps inspired by the Biblical milieu, courts have described the current state of the law as both "Establishment Clause purgatory," *ACLU v. Mercer County*, 432 F.3d 624, 636 (6th Cir. 2005), and "Limbo," *Green v. Bd. of County Comm'rs*, 450 F. Supp. 2d 1273, 1285 (E.D. Okla. 2006).

Standing at the intersection of *Van Orden* and *McCreary* for the first time, the path we must follow is clear.[9] Our study of the cases leads us to two conclusions. First, that the three-part test set forth in *Lemon* and modified in *Agostini* remains the general rule for evaluating whether an Establishment

---

[9]Some courts have applied both the *Van Orden* and the *Lemon* analysis in Eagles monument cases. *See ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 778 n.8 (8th Cir. 2005) (en banc) (applying *Van Orden*, but then asserting in a footnote that the same decision would result under *Lemon*); *ACLU of Ohio Found. v. Bd. of Comm'rs*, 444 F. Supp. 2d 805, 816 (N.D. Ohio 2006) (applying both *Lemon* and *Van Orden*). *But see Twombly v. City of Fargo*, 388 F. Supp. 2d 983, 986-90 (D.N.D. 2005) (applying only *Van Orden*).

Clause violation exists. *See McCreary*, 545 U.S. at 859; *see also Vasquez v. Los Angeles County*, 487 F.3d 1246, 1254-55 (9th Cir. 2007) (holding that *McCreary* reaffirms *Lemon*), *cert. denied*, 128 S. Ct. 711 (2007).

Second, that we do not use the *Lemon* test to determine the constitutionality of some longstanding plainly religious displays that convey a historical or secular message in a nonreligious context. As Justice Breyer stated in *Van Orden*,

> If the relation between government and religion is one of separation, but not of mutual hostility and suspicion, one will inevitably find difficult borderline cases. And in such cases, I see no test-related substitute for the exercise of legal judgment. . . . Rather, to determine the message that the text here conveys, we must examine how the text is *used*. And that inquiry requires us to consider the context of the display.

545 U.S. at 700-01 (Breyer, J., concurring in the judgment). Similarly, as Chief Justice Rehnquist stated in the plurality opinion,

> Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds. Instead, our analysis is driven both by the nature of the monument and by our Nation's history.

*Id.* at 686 (plurality opinion). Therefore, we must examine both *McCreary* and *Van Orden*, and exercise our legal judgment to determine whether Everett's monument to the Commandments passes constitutional muster.

### 1. *McCreary County v. ACLU*

**[3]** In *McCreary*, the Court invalidated displays of the Ten Commandments in two Kentucky courthouses. 545 U.S. at 858. The displays were at first simply "large, gold-framed copies of an abridged text of the King James version of the Ten Commandments, including a citation to the Book of Exodus." *Id.* at 851. In the course of litigation, the counties altered the displays twice, each time adding to them arguably greater secular or historical content. *Id.* at 853-56. The majority applied the *Lemon* test, focusing heavily on the question of the counties' purpose. *Id.* at 862 ("[A]n understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts."). The Court explained that "[t]he point is simply that the original text [of the Ten Commandments] viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction. When the government initiates an effort to place this statement alone in public view, a religious object is unmistakable." *Id.* at 869. For this reason, the first display failed under the secular purpose prong of *Lemon*, as it must. *See Stone*, 449 U.S. at 39-43. In examining and invalidating the two subsequent versions, the Court rejected the county's claim that they evinced a secular purpose, because purpose must be evaluated as if by "one presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *McCreary*, 545 U.S. at 866; *see also id.* at 874 ("[A]n implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense."). There can be little doubt after *McCreary* not only that *Lemon* is still alive but that the secular purpose inquiry has been fortified. *See id.* at 900-03 (Scalia, J., dissenting).

### 2. *Van Orden v. Perry*

In *Van Orden*, the Supreme Court's contemporaneous exegesis, neither the plurality nor Justice Breyer's vital concurrence in the judgment reaches its result by applying *Lemon*. 545 U.S. at 686 (plurality opinion) ("[W]e think [*Lemon* is] not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds."); *id.* at 700 (Breyer, J., concurring in the judgment) ("While the Court's prior tests . . . might well lead to the same result the Court reaches today[,] no exact formula can dictate a resolution to such fact-intensive cases.") (citation omitted).[10] As we have discussed, the *Van Orden* decision is not the first time that the Court has decided that the *Lemon* test was not applicable in an Establishment Clause case. *See, e.g.*, *Marsh*, 463 U.S. at 791, 795. Because the Supreme Court issued *McCreary*, broadly espousing *Lemon*, contemporaneously with *Van Orden*, narrowly eschewing *Lemon*, we must read the latter as carving out an exception for certain Ten Commandments displays. We cannot say how narrow or broad the "exception" may ultimately be; not all Ten Commandments displays will fit within the exception articulated by Justice Breyer. However, we can say that the exception at least includes the display of the Ten Commandments at issue here.

---

[10]The Court's plurality opinion avoided the purpose inquiry, holding that, due to the "passive" nature of the Texas Decalogue, the Court only need consider the history and context of the display to determine that it passed constitutional scrutiny. *Van Orden*, 545 U.S. at 691 (plurality opinion). However, the controlling opinion in *Van Orden* is, of course, that of Justice Breyer. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)); *see United States v. Williams*, 435 F.3d 1148, 1157 n.9 (9th Cir. 2006) ("Applying *Marks*' rule, we have often construed one Justice's concurring opinion as representing a logical subset of the plurality's and as adopting a holding that would affect a narrower range of cases than that of the plurality.").

*Van Orden* involved a challenge to an Eagles-donated monolith on the grounds of the Texas Capitol.[11] The Capitol is surrounded by twenty-two acres of land, which "contain 17 monuments and 21 historical markers commemorating the 'people, ideals, and events that compose Texan identity.' "[12] 545 U.S. at 681 (quoting Tex. H. Con. Res. 38, 77th Leg., Reg. Sess. (2001)).[13] The Texas monument is identical to the Everett monument, save for the dedication at the base which reads "PRESENTED TO THE PEOPLE AND YOUTH OF TEXAS BY THE FRATERNAL ORDER OF EAGLES OF TEXAS 1961." *Id.* at 681-82. "The legislative record surrounding the State's acceptance of the monument from the Eagles . . . is limited to legislative journal entries." *Id.* at 682. While the State selected the location where it was placed, "[t]he Eagles paid the cost of erecting the monument, the dedication of which was presided over by two state legislators." *Id.*

Justice Breyer based his reasoning "upon consideration of the basic purposes of the First Amendment's Religion Clauses themselves." *Id.* at 703-04 (Breyer, J., concurring in the judgment). He stressed that in "difficult borderline cases," there is "no test-related substitute for the exercise of legal judgment." *Id.* at 700. Further, such analysis, to "remain faithful to the underlying purposes of the Clauses . . . must take account of context and consequences measured in light of those pur-

---

[11]*See* Appendix B, *infra.*

[12]The monuments are: Heroes of the Alamo, Hood's Brigade, Confederate Soldiers, Volunteer Fireman, Terry's Texas Rangers, Texas Cowboy, Spanish-American War, Texas National Guard, Ten Commandments, Tribute to Texas School Children, Texas Pioneer Woman, The Boy Scouts' Statue of Liberty Replica, Pearl Harbor Veterans, Korean War Veterans, Soldiers of World War I, Disabled Veterans, and Texas Peace Officers. *Van Orden*, 545 U.S. at 681 n.1.

[13]We note that the legislative declaration of the purpose of the Texas Capitol displays cited by the Court post-dates most, if not all of the monuments, suggesting that the contemporary purpose of the displays is relevant.

poses." *Id*. Among the purposes that he recognized are: (1) "to assure the fullest possible scope of religious liberty and tolerance for all"; (2) "to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike"; and (3) "to maintain that separation of church and state that has long been critical to the peaceful dominion that religion exercises in this country, where the spirit of religion and the spirit of freedom are productively united, reigning together but in separate spheres on the same soil." *Id*. at 698 (citations, quotations and alterations in original omitted).[14]

He referred to *Van Orden* as a "borderline case," noting that the text of the Ten Commandments "undeniably has a religious message," but that the text itself was not determinative because the Court must examine "the message that the text . . . conveys . . . [in] the context of the display." *Id*. at 700-01. He reiterated the nature of the Ten Commandments in some contexts as "a secular moral message" or as "a historical message." *Id*. at 701. He then marshaled facts that he deemed relevant to making this determination. Viewing Justice Breyer's factual analysis side by side with the factual circumstances here, it becomes clear that Card's case fits within the *Van Orden* exception.

## C.   Applying *Van Orden*

The district court noted that the "context of the monument at issue in this case is remarkably similar to that presented to the Supreme Court in *Van Orden*," and found "that the analysis and holding of *Van Orden* governs this case." *Card v. City of Everett*, 386 F. Supp. 2d 1171, 1173 (W.D. Wash. 2005). We agree.

---

[14]Justice Breyer also endorsed Justice O'Connor's concurrence in *McCreary* as embodying the purposes of the Religion Clauses. *Van Orden*, 545 U.S. at 698 (Breyer, J., concurring in the judgment).

## 1. Secular Purpose

**[4]** Justice Breyer first looked to the purpose of the monument, finding that its history suggested a secular purpose. *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring in the judgment). The Eagles are a "private civic (and primarily secular) organization . . . [which] sought to highlight the Commandments' role in shaping civic morality as a part of [its] efforts to combat juvenile delinquency." *Id.* Further, "[t]he Eagles' consultation with a committee composed of members of several faiths in order to find a nonsectarian text underscores the group's ethics-based motives." *Id.* The presence of the graven dedication from the Eagles on the face of the monument "further distances the State itself from the religious aspect of the Commandments' message." *Id.* at 701-02.

**[5]** This analysis suggests two facets to the secular purpose analysis: (1) the actual purpose of the monument; and (2) perceptions of that purpose by viewers. Justice Breyer focused on the Eagles' purpose, presumably in part as a proxy for the State's intent, which like here, was not well documented. The district court found that the Eagles "had a strong interest in the religious aspects of the Ten Commandments." *Card*, 386 F. Supp. 2d at 1176. But, it also concluded that there were secular aspects to the monument, including "provid[ing] a dramatic visual reminder of proper and, at the time, uncontroversial standards of social conduct," and "ties to a recent Hollywood blockbuster movie, Mr. DeMille's 'The Ten Commandments.' " *Id.* Further, the district court properly recognized the importance of differentiating between the Eagles' goals and the City's goals in accepting the gift from "a well-respected community organization: a desire to reduce juvenile delinquency, to show appreciation for the organization's efforts, or even to obtain inexpensive works of art on a scale large enough to decorate public property . . . ." *Id.*

**[6]** We agree with the district court's analysis of the monument's purpose. The City's intent is the key here, and nothing

apart from the monument's text suggests a religious motive on the City's part. We reject Card's assertion that the presence of clergy at the dedication ceremony distinguishes this situation from *Van Orden*.[15] All indications in the record are that the Eagles arranged and funded the dedication. While the Mayor was present to accept the monument, as noted above, the City had many plausible secular reasons for accepting the gift, and we will not infer a non-secular purpose. We agree with the City that there is also some contemporary historic relevance to the monument—as a testament to the Eagles' lengthy relationship with, and contributions to, the City.

**[7]** Finally, we agree with the district court that, exactly like the monument in *Van Orden*, this monument bears a prominent inscription showing that it was donated to the City by a private organization. As in *Van Orden*, this serves to send a message to viewers that, while the monument sits on public land, it did not sprout from the minds of City officials and was not funded from City coffers.

## 2. Suggestion of the Sacred

**[8]** Justice Breyer next looked to the setting of the monument, finding that it "suggest[ed] little or nothing of the sacred." *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment). The monument was located in a "large park" with numerous other remembrances of the ideals of the settlers of the State of Texas, and in a "setting [that] does not readily lend itself to meditation or any other religious activity." *Id.* Thus, Justice Breyer concluded that the physical setting "suggests that the State intended the display's moral message — an illustrative message reflecting the historical 'ideals' of Texans — to predominate." *Id.* Here, again, Justice Breyer's analysis is bifurcated, asking: (1) whether the dis-

---

[15]That clergy participated in the dedication of the monument, a factor discussed in *McCreary*, 545 U.S. at 869, as demonstrating religious purpose, does not remove this case from *Van Orden*'s ambit.

play includes other elements that suggest a secular message; and (2) if the physical setting is conducive to religious activities. *Id.* at 701-02.

**[9]** The district court did not rely on the presence of the other monuments and markers in its analysis. Everett's collection of monuments—consisting of the monument, the three war memorial monoliths and the plaque on Old City Hall—is certainly more modest in scope than that in *Van Orden*. This remains true even accepting the City's characterization of the war memorial as three separate monuments, and including the five monuments located on adjacent county land. The City argues that these monuments have all been erected in a much smaller area than the Texas Capitol. However, we do not read *Van Orden* as establishing a quota system for monuments or a requirement for a particular density of monuments in a given area. We see more similarities than differences here: Like the display in Texas, the Everett Eagles monument is the only facially religious monument, while the balance of the monuments are memorials to wars or to citizen service, and the lack of additional City monuments may be only a testament to a disparity in resources between the City of Everett and the State of Texas.

**[10]** The district court judge visited Old City Hall, and observed that there was "an air of neglect or disregard," in the display of the monument. *Card*, 386 F. Supp. 2d at 1176; *see* Appendix A. Discussing the 1988 relocation, the court noted that "[n]ot only was it moved off of its corner perch . . . but the City opted to relocate it to a spot behind one of the three War Memorial monoliths and almost surrounded by trees and shrubs that significantly impair most views of the monument." *Id.* The court further noted that, while the memorial was illuminated and had benches in front of it, the monument had neither. These features combine to create a setting that does not "lend itself to meditation or any other religious activity." *Id.* at 1176-77 (quoting *Van Orden*, 545 U.S. at 702

(Breyer, J., concurring)). We agree entirely that nothing about the setting is conducive to genuflection.[16]

### 3.  Historic Lack of Complaints

[11] Justice Breyer found that in addition to the purpose and setting of the display, another factor was "determinative." *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment). He noted that the monument had stood passively by for forty years without complaint, holding that:

> [T]hose 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, to engage in any religious practice, to compel any religious practice, or to work deterrence of any religious belief.

*Id.* (quotations and alterations in original omitted). To hold the Texas display unconstitutional would "exhibit a hostility toward religion that has no place in our Establishment Clause traditions." *Id.* at 704. Justice Breyer voiced concern that such a ruling would lead to attempts to remove "longstanding depictions of the Ten Commandments from public buildings across the Nation," and thus "create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." *Id.*

[12] While two citizens and one organization wrote seven complaints about the monument in Everett, those complaints similarly did not surface until the monument had been in

---

[16]There is also no evidence that any remotely religious activities, other than the original dedication, have been held at the monument.

place for over thirty years.[17] The district court held that under such similar facts, this factor was also determinative. *Card*, 386 F. Supp. 2d at 1177. We agree that Justice Breyer's longevity rationale applies equally here as it did in *Van Orden*.

## IV. CONCLUSION

**[13]** Reading *Van Orden* and *McCreary* together, we conclude a limited exception to the *Lemon* test exists in contexts closely analogous to those in *Van Orden*. This case presents such a closely analogous context. Therefore, it is clear that *Van Orden* controls our decision. Accordingly, the City of Everett's Ten Commandments display does not run afoul of the Establishment Clauses of the United States or Washington State Constitutions.

**AFFIRMED.**

---

[17]Because the monument was moved only about ten feet from its original position, we view the preceding thirty years as the appropriate time period to use in the *Van Orden* longevity analysis.

# APPENDIX A

The Ten Commandments monument in Everett, Washington.

# APPENDIX B

The Ten Commandments monument in Austin, Texas at issue in *Van Orden*.

FERNANDEZ, Circuit Judge, concurring:

While, with all due respect, I cannot fully join in Judge Wardlaw's opinion, I do concur.

I applaud Judge Wardlaw's scholarly and heroic attempt to create a new world of useful principle out of the Supreme Court's dark materials.[1] Alas, even my redoubtable colleague cannot accomplish that. The still stalking *Lemon* test[2] and the other tests and factors, which have floated to the top of this chaotic ocean from time to time in order to answer specific questions, are so indefinite and unhelpful that Establishment Clause jurisprudence has not become more fathomable. Would that courts required neutrality in the area of religion and nothing more or less.[3]

More to the purpose, this case, as Judge Wardlaw wisely notes, is controlled by *Van Orden v. Perry*, 545 U.S. 677, 125 S. Ct. 2854, 162 L. Ed. 2d 607 (2005). Because of that and because I see no possibility whatsoever that the presence of this monument has established, or has tended to establish, or will establish religion,[4] I concur in the result.

---

[1] *Cf. Milton*, *Paradise Lost*, Book II, ll. 915-16.

[2] *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398, 113 S. Ct. 2141, 2149, 124 L. Ed. 2d 352 (1993) (Scalia, J., concurring) ("Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again . . . .").

[3] *See Newdow v. U.S. Congress*, 328 F.3d 466, 490-91 (9th Cir. 2003) (Fernandez, J., concurring and dissenting), *rev'd*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004).

[4] *See Newdow*, 328 F.3d at 491-93 (Fernandez, J., concurring and dissenting).