**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS



FOR THE NINTH CIRCUIT

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., a Wisconsin non-profit corporation, | No. 13-35770 |
| Plaintiff - Appellant, | D.C. No. 9:12-cv-00019-DLC |
| v. | MEMORANDUM[*] |
| CHIP WEBER, Flathead National Forest Supervisor and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants - Appellees, | |
| WILLIAM R. GLIDDEN; et al., | |
| Intervenor-Defendants - Appellees. | |

Appeal from the United States District Court
for the District of Montana
Dana L. Christensen, Chief District Judge, Presiding

Argued and Submitted July 7, 2015
Portland, Oregon

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Before: PREGERSON, N.R. SMITH, and OWENS, Circuit Judges.

Freedom From Religion Foundation, Inc. ("FFRF") appeals from the district court's award of summary judgment to the United States Forest Service ("USFS") and Knights of Columbus ("Knights"). The district court held that the government's continued authorization of a Jesus Christ statue located on national forest land did not violate the Establishment Clause. Because the parties are familiar with the facts, we do not recount them except as necessary. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.[1]

FFRF satisfied the three organizational standing requirements. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). First, FFRF-member Pamela Morris would be able to sue in her own right; she "made a conscious effort to avoid Big Mountain because of the Jesus Statue," which she found "intrusive" and "out of place." *See Hewitt v. Joyner*, 940 F.2d 1561, 1564 (9th Cir. 1991) (standing to contest religious displays where displays curtailed plaintiffs' use of park); *Buono v. Norton*, 371 F.3d 543, 546-48 (9th Cir. 2004) (alleged injury was sufficient where plaintiff was "unable to 'freely us[e]' the area

---

[1] We review de novo the district court's decisions regarding standing and summary judgment. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087 (9th Cir. 2010).

2

of the Preserve around the cross" (alteration in original)).  Second, the interests

FFRF sought to protect were germane to the organization's purpose.  *See Hunt*,

432 U.S. at 343.  And third, because FFRF requested declaratory and injunctive

relief, not money damages, the Establishment Clause claim and the relief sought

did not necessitate individual member participation.  *See Columbia Basin*

*Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001).

As to the merits, the government's continued authorization of the statue on

federal land does not violate the Establishment Clause.[2]

First, USFS's decision to renew the statue's permit reflected a primarily

secular purpose.  *Trunk v. City of San Diego*, 629 F.3d 1099, 1107 (9th Cir. 2011)

("[W]e first inquire as to the purpose of the government action to determine

whether it is predominantly secular in nature.").  The government identified secular

rationales for its continued authorization including the statue's cultural and

historical significance for veterans, Montanans, and tourists; the statue's inclusion

in the National Register of Historic Places; and the government's intent to preserve

the site "as a historic part of the resort."  *See Access Fund v. U.S. Dep't of Agric.*,

499 F.3d 1036, 1043 (9th Cir. 2007) (site's inclusion in the National Register of

---

[2] Our analysis assumes, without deciding, that USFS's continued authorization of the statue on public land constitutes government action.

Historical Places evinces Forest Service's secular motivations—"the preservation of a historic cultural area"); *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) ("A reviewing court must be 'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose.").

Although the dissent focuses on the monument's appearance, that the statue is of a religious figure, and that some of the initial impetus for the statue's placement was religiously motivated, does not end the matter. *See Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring in the judgment) ("[T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious."). USFS's "intent is the key here, and nothing apart from the [statue's likeness] suggests a religious motive on [USFS's] part." *See Card v. City of Everett*, 520 F.3d 1009, 1019-20 (9th Cir. 2008); *Access Fund*, 499 F.3d at 1044.

Second, USFS's permit authorization did not constitute an endorsement of religion. *See Trunk*, 629 F.3d at 1107, 1109-10. Our determination is based on the following: (1) there is nothing in the statue's display or setting to suggest government endorsement; the twelve-foot tall statue is on a mountain, far from any government seat or building, near a commercial ski resort, and accessible only to individuals who pay to use the ski lift; (2) the statue's plaque communicates that it

4

is privately owned and maintained—"it did not sprout from the minds of [government] officials and was not funded from [the government's] coffers," *see Card*, 520 F.3d at 1020; (3) besides the statue's likeness, there is nothing in the display or setting to suggest a religious message. The mountain's role as a summer and winter tourist destination used for skiing, hiking, biking, berry-picking, and site-seeing suggests a secular context; the location "does not readily lend itself to meditation or any other religious activity," and the setting "suggests little or nothing of the sacred," *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment); *see also Card*, 520 F.3d at 1020; (4) the flippant interactions of locals and tourists with the statue suggest secular perceptions and uses: decorating it in mardi gras beads, adorning it in ski gear, taking pictures with it, high-fiving it as they ski by, and posing in Facebook pictures; (5) local residents commonly perceived the statue as a meeting place, local landmark, and important aspect of the mountain's history as a ski area and tourist destination; and, (6) there is an absence of complaints throughout its sixty-year history, *see Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment) (reasoning that the monument's forty-year unchallenged history "suggest[s] more strongly than can any set of formulaic tests that few individuals . . . are likely to have understood the monument as amounting . . . to a government effort to favor a particular religious sect, . . . to 'compel' any

5

'religious practic[e],' or to 'work deterrence' of any 'religious belief'" (alterations in original)).

Finally, the facts of this case are not commensurate with *Trunk*'s facts: (1) the forty-three foot tall cross in *Trunk* was "visible from miles away and tower[ed] over the thousands of drivers who travel[ed] daily on Interstate 5," 629 F.3d at 1103; (2) the cross's plaque, identifying it as a war memorial, was added only after litigation began, *id.* at 1101, 1119; (3) for the majority of its history, the cross was not, in fact, a war memorial, but a religious symbol and a place where Easter services continued for more than forty years, *id.* at 1119-20; (4) the memorial's location "in the heart of a largely homogenous and exclusionary community" had a "history of anti-Semitism that reinforce[d] the Memorial's sectarian effect," *id.* at 1121-22; and, (5) at least for the last two decades, the cross had "become a flashpoint of secular and religious divisiveness," and "heated litigation," *id*. at 1122.

Appellant shall bear all costs on appeal.

**AFFIRMED**.

*Freedom from Religion Found. v. Weber*, No. 13-35770
Portland - July 7, 2013

Judge N.R. Smith, concurring:

Given the assumption made by both the majority and the dissent—that the Forest Service's action (the renewal of a special use permit) constituted government action that could violate the Establishment Clause—I agree with the majority. Under both the *Lemon* and *Van Orden* tests, the Forest Service did not violate the Establishment Clause. However, I write separately, because the assumption is incorrect. The Forest Service's renewal of a special use permit for an existing monument does not constitute government speech.

"There is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 250 (1990). When a private speaker utilizes public property as a forum for expression, government allowance of that expression does not violate the Establishment Clause as long as the expression is permitted in a "non-discriminatory manner." *See Kreisner v. City of San Diego*, 1 F.3d 775, 776 (9th Cir. 1993). In short, "[r]eligious expression cannot violate the Establishment Clause where it (1) is purely private and (2)

1

occurs in a traditional or designated public forum, publicly announced and open to all on equal terms." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 770 (1995).

The Knights' decision to place a statue of Jesus at the Big Mountain Ski Resort was purely private expression. So, too, is the Knights' ongoing maintenance and support of the monument. The only involvement that the government has had in relation to the monument is (1) the issuance of a special use permit in 1953, and (2) reissuance of the permit in 1990, 2000, and 2012. However, the allowance of private speech on public property does not necessarily turn the private speech into government speech. *See id.* at 761-63; *Kreisner*, 1 F.3d at 784-85.

The key question is whether the Forest Service land has constituted a traditional or designated public forum, publicly announced and open to all on equal terms. *See Capitol Square*, 515 U.S. at 770. History evidences that it has. From 1942 until 1998 (when the Forest Service substantially overhauled its regulations governing special use permits), the Forest Service had a general policy of granting special use permits as long as the permitees "compl[ied] with all State and Federal laws and all regulations of the Secretary of Agriculture relating to the national forests and . . . conduct[ed] themselves in an orderly manner." 36 C.F.R. § 251.1

2

(1944).  During this time period, nearly seventy permanent monuments were erected on Forest Service land, with special use permits being issued to a wide variety of groups, corporations, and individuals.  From 1942 to 1998, there can be no question that Forest Service land qualified as a designated public forum.  *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) ("[A] government entity may create 'a designated public forum' if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." (citation omitted)).  FFRF has not provided any evidence that the Forest Service limited access to the its land in a discriminatory way; in fact the record demonstrates that the land was open to all on equal terms.

Additionally, the Forest Service's renewals of the Knights' special use permit were done in accordance with neutral, non-discriminatory criteria. Renewals of existing special use permits are governed by 36 C.F.R. § 251.64.  That regulation states, "When a special use authorization provides for renewal, the authorized officer *shall renew it* where such renewal is authorized by law, if the project or facility is still being used for the purpose(s) previously authorized and is being operated and maintained in accordance with all the provisions of the authorization." *Id.* (emphasis added).  The Knights' permit complied with these requirements.  For the reasons explained in the majority decision, renewal was

3

lawful. Further, the monument was still being used for the purpose previously authorized and was operated and maintained in accordance with the permit. That all permit renewals must satisfy these same, content-neutral criteria demonstrates the neutrality of the Forest Service's decision.

Further, the Forest Service's comments during the renewal process (that such permits would not be granted under the new regulations and that permits for other proposed monuments had been rejected) did not display favoritism for the Knights, but merely reflected the change in the regulations that occurred in 1998. Since 1998, the grant of new special use permits has been governed by 36 C.F.R. § 251.54, which requires (amongst a long list of other things) that a new permit "will not create an exclusive or perpetual right of use or occupancy." *Id.* § 251.54(e)(1)(iv). The Forest Service Handbook[1] explains that to satisfy that criterion, the proposed use should "not in effect grant title to Federal land to an authorization holder or . . . create the appearance of granting such a right." FS Handbook 2709.11, ch. 10, sec. 12.21, para. 4 (2013). As an example of a use that may violate this criterion, the Handbook provides "[c]emeteries, monuments, or other memorials." *Id.* Therefore, obtaining a permit to place a new monument

---

[1]The Forest Service Handbook is available at http://www.fs.fed.us/im/directives/dughtml/fsh_1.html.

under the current regulations would likely be extremely difficult, if not impossible.

However, this criterion does not apply to renewals of *existing* special use permits.

As explained above, the renewal of existing permits must only comply with the

neutral requirements of 36 C.F.R. § 251.64. Therefore, that the Forest Service

would not grant a *new* permit to the Knights under the current regulations is

irrelevant. Like all other existing special use permit holders, the Knights only

needed to comply with neutral regulations to maintain their special use permit.

Thus, the Forest Service's renewal of the Knights' permit did not evidence a bias

in favor of religion.

Finally, FFRF argues that *Pleasant Grove City, Utah v. Summum* prevents us

from conducting a forum analysis in this case, because forum analysis does not

apply to permanent monuments on public property. To support that argument,

FFRF relies on a portion of a sentence from *Summum* which stated, "[F]orum

analysis simply does not apply to the installation of permanent monuments on

public property." *Summum*, 555 U.S. at 480. However, FFRF takes the language

from *Summum* out of context. Instead, the Court said:

> To be sure, there are limited circumstances in which the forum
> doctrine might properly be applied to a permanent monument—for
> example, if a town created a monument on which all of its residents
> (or all those meeting some other criterion) could place the name of a
> person to be honored or some other private message. But as a general

5

matter, forum analysis simply does not apply to the installation of permanent monuments on public property.

*Id*. This language did not create a categorical rule against forum analysis when dealing with permanent monuments. Further, this is one of those limited circumstances where forum analysis is appropriate. Rather than dealing with a 2.5-acre city park, which may have a difficult time accommodating permanent monuments from any and all individuals or groups that may wish to utilize the forum, we are dealing with the Forest Service's 193-million acres, which does not have the same constraint. Therefore, the conclusion that the Forest Service's land constituted a designated public forum does not conflict with *Summum*.

*Freedom from Religion Foundation, Inc. v. Weber and United States Forest Service*, No. 13-35770

PREGERSON, Circuit Judge, dissenting:

The First Amendment freedom of religion clauses serve "to assure the fullest possible scope of religious liberty and tolerance for all[,] . . . to avoid that divisiveness based upon religion that promotes social conflict[, and] . . . to maintain that separation of church and state that has long been critical to the peaceful dominion that religion exercises in this country." *Trunk v. City of San Diego*, 629 F.3d 1099, 1110 (9th Cir. 2011) (citing *Van Orden v. Perry*, 545 U.S. 677, 678 (2005)).

First, despite arguments to the contrary, a twelve-foot tall statue of Jesus situated on government-leased land cannot realistically be looked upon as "predominantly secular in nature." *Id.* at 1107.

Second, to determine the effect of the statue we ask whether "it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion." *Id.* at 1109 (quoting *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1398 (9th Cir. 1994)). I submit that a "reasonable observer would perceive" the statue situated on government land "as projecting a message of religious endorsement." *Id.* at 1118.

I respectfully dissent.