**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 30, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES W. GREEN, an individual;
AMERICAN CIVIL LIBERTIES
UNION OF OKLAHOMA, a
non-profit corporation,

        Plaintiffs - Appellants,

v.

HASKELL COUNTY BOARD OF
COMMISSIONERS, also known as
Board of County Commissioners of
Haskell County, Oklahoma; KENNY
SHORT, in his official capacity as
Chairman of the Haskell County Board
of Commissioners,

        Defendants - Appellees,

No. 06-7098

---

MAINSTREAM BAPTIST
NETWORK; OKLAHOMA
MAINSTREAM BAPTISTS;
AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE; AMERICAN CENTER FOR
LAW AND JUSTICE; THE
NATIONAL LEGAL FOUNDATION;
AMERICAN LEGION # 182; and
FOUNDATION FOR MORAL LAW,

        Amici Curiae.

**ORDER**

Before **HENRY,** Chief Circuit Judge, **TACHA, KELLY, BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN, McCONNELL, TYMKOVICH, GORSUCH,** and **HOLMES**, Circuit Judges.

Defendants-Appellees' Petition for Rehearing En Banc is denied. A poll was requested. On a vote of six to six of the active members of the Court, rehearing en banc was denied. Fed. R. App. P. 35(a). Judges Tacha, Kelly, O'Brien, McConnell, Tymkovich, and Gorsuch would grant rehearing en banc.

Entered

for the Court,

*Elisabeth A. Shumaker*

ELISABETH A. SHUMAKER, Clerk

06-7098, <u>Green v. Haskell County Board of County Commissioners</u>

**KELLY**, Circuit Judge, dissenting from the denial of rehearing en banc, with whom **TACHA** and **TYMKOVICH**, Circuit Judges, join.

The court's decision in this case perpetuates a regrettable misapprehension of the Establishment Clause: that recognition of the role of religion in this country's founding, history, traditions, and laws is to be strictly excluded from the civic sphere. The court's analysis misconstrues—and in so doing multiplies the errors inherent in—the Supreme Court's already-questionable "tests"[1] used to analyze passive acknowledgments of religion such as Ten Commandments monuments. The opinion strongly suggests that Ten Commandments displays authorized by small-town commissioners who harbor personal religious beliefs are unconstitutional establishments of religion. Such a conclusion is not only inconsistent with the original meaning of the Establishment Clause,[2] but is also

---

[1] Whether <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971), and its progeny actually create discernible "tests," rather than a mere ad hoc patchwork, is debatable. The judicial morass resulting from the Supreme Court's opinions "raises the . . . concern that, either in appearance or in fact, adjudication of Establishment Clause challenges turns on judicial predilections." <u>Van Orden v. Perry</u>, 545 U.S. 677, 697 (2005) (Thomas, J., concurring).

[2] Public acknowledgments of religion at the founding and continuing to this day have been well-documented. <u>See</u> <u>Van Orden</u>, 545 U.S. at 686-90 (plurality opinion); <u>McCreary County v. ACLU</u>, 545 U.S. 844, 885-89, 895-900 (2005) (Scalia, J., dissenting); <u>Lynch v. Donnelly</u>, 465 U.S. 668, 672-678 (1984). In short, "[t]here is an unbroken history of official acknowledgment by all three

(continued...)

plainly contrary to the Supreme Court's precedent in <u>Van Orden v. Perry</u>, 545 U.S. 677 (2005).

In accord with our precedent in <u>O'Connor v. Washburn University</u>, 416 F.3d 1216, 1223-24 (10th Cir. 2005), the court analyzed the constitutionality of the Ten Commandments display at issue in this case in light of <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971), as modified by Justice O'Connor's endorsement analysis. While not advocating that test, I am satisfied, for present purposes, to remain within the <u>Lemon</u> framework despite the plentiful—and meritorious—criticism of it.[3] <u>See</u> <u>Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.</u>, 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring) (collecting

_____

[2](...continued)
branches of government of the role of religion in American life from at least 1789." <u>Lynch</u>, 465 U.S. at 674. The acknowledgment of the role of religion in our public institutions "follows the best of our traditions" and "respects the religious nature of our people." <u>Zorach v. Clauson</u>, 343 U.S. 306, 314 (1952). A mode of analysis that ignores this tradition of acknowledgment, and the original understanding of the Establishment Clause that it suggests, is suspect at best. <u>See</u> <u>Marsh v. Chambers</u>, 463 U.S. 783, 790 (1983) ("[H]istorical evidence sheds light . . . on what the draftsmen intended the Establishment Clause to mean.").

[3] Though not yet adopted by a majority opinion from the Supreme Court, a test focusing on actual legal coercion, rather than endorsement, appears the most faithful to the original meaning of the Establishment Clause. <u>See</u> <u>Van Orden</u>, 545 U.S. at 693 (Thomas, J., concurring); <u>Lee v. Weisman</u>, 505 U.S. 577, 640-43 (1992) (Scalia, J., dissenting); Michael W. McConnell, <u>Coercion: The Lost Element of Establishment</u>, 27 Wm. & Mary L. Rev. 933 (1987). Of course, under this standard, the display at issue would survive scrutiny. <u>See</u> <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 664 (1989) (Kennedy, J., concurring in part and dissenting in part).

criticism of Lemon); County of Allegheny v. ACLU, 492 U.S. 573, 669-76 (1989) (Kennedy, J., concurring in part and dissenting in part) (critiquing the endorsement test); Michael Stokes Paulsen, Lemon Is Dead, 43 Case W. Res. L. Rev. 795, 800-25 (1993). What is troubling, however, is the court's inflexible adherence to Lemon and the endorsement test despite Van Orden, given that Lemon has been rejected by a majority of justices while Justice Breyer's controlling concurrence in Van Orden remains good law. See McCreary County v. ACLU, 545 U.S. 844, 890 (2005) (Scalia, J., dissenting) (recounting criticism of Lemon by various justices); Marks v. United States, 430 U.S. 188, 193 (1977) (stating that the concurrence on the narrowest grounds controls).

This court's opinion contravenes Van Orden and misconstrues the endorsement analysis by (1) improperly creating a per se rule that new Ten Commandments displays are unconstitutional as long as someone files suit quickly; (2) placing too much emphasis on the fact that this was a small town, thereby making the effect of the Establishment Clause depend on the size of the community; and (3) conducting a subjective analysis rather than an objective analysis. Under a proper application of the Supreme Court's precedent, this Ten Commandments display is constitutional.

I.    The Conflict with *Van Orden*

      A.    Factual Similarities

The disposition in this case cannot be reconciled with <u>Van Orden</u>, which ought to control given the substantial similarities between the operative facts in the two cases. As in <u>Van Orden</u>, this Ten Commandments display is located outside, on the grounds of a public building—here a county courthouse—along with other secular displays. These displays include a war memorial for World Wars I and II (the largest monument on the lawn); smaller monuments for Vietnam and Korea, the Choctaw Nation, the unmarked graves in Haskell County, and the Classes of 1954 and 1955; as well as a sidewalk composed partly of "personal message bricks" commemorating various individuals and groups. <u>Green v. Bd. of County Comm'rs of County of Haskell</u>, 450 F. Supp. 2d 1273, 1274-75 (E.D. Okla. 2006), <u>rev'd</u>, 568 F.3d 784 (10th Cir. 2009). All of these monuments are within seventy-five feet of each other, and thus can all be considered to be a single group of monuments. Furthermore, the Ten Commandments display was not in the most prominent place on the courthouse lawn.[4] "The physical setting of the monument," therefore, "suggests little or nothing of the sacred." <u>Van Orden</u>, 545 U.S. at 702 (Breyer, J., concurring).

---

[4] The district court stated, "Quite simply, the Monument is not particularly large, and is not in a clearly high traffic area. It may face a busy street, but so do almost all the monuments on the lawn. Furthermore, the Monument does not appear to be placed in an area that is the most frequented route taken to the courthouse by citizens going there to undertake business." <u>Green</u>, 450 F. Supp. 2d at 1294 (footnote omitted).

The fact that the monument is surrounded by other secular displays is of considerable importance under existing precedent. See id.; County of Allegheny, 492 U.S. at 595-96, 598-600, 616-19 (plurality opinion); Lynch v. Donnelly, 465 U.S. 668, 692 (1984); O'Connor, 416 F.3d at 1228; cf. ACLU v. City of Plattsmouth, 419 F.3d 772, 779 (8th Cir. 2005) (en banc) (Bye, J., dissenting) (noting that the court upheld a display standing alone). And yet, the court dismisses this consideration out-of-hand, reasoning that the collection is less cohesive, integrated, and artistic than the collection in Van Orden. Green, 568 F.3d at 805-06. How an aesthetic critique of the monuments distinguishes this case in any meaningful way from Van Orden is puzzling. Federal courts do not sit as landscape architects or arbiters of style to decide whether small-town commissioners have sufficiently sophisticated taste.

The court protests, perhaps too much, that the critical factor here is not mere aesthetics, but rather the failure to have a "unifying, cohesive secular theme." Id. at 806 n.16. That, too, is in the eye of the beholder; as I suggest below, the collection of monuments does have a theme—celebration of Haskell County's history and moral ideals. The display of monuments does not have to be comprehensive; it is enough that the display celebrates a selection of events, people, and ideals that mark and measure the lives of Haskell County's citizens. Moreover, the court's opinion has created a catch-22: the commissioners could

-5-

either exercise direct control over the creation of monuments (rendering the message more likely to be identified with the government), or they could take a hands-off, neutral approach (creating the possibility of a disunified theme). Either way, under the court's opinion, the commissioners lose. Accordingly, we should not rely on such an easily manipulated rationale as "cohesiveness" to distinguish this case from Van Orden.

The only legally relevant consideration is whether there are sufficient other monuments such that, taken as a whole, the display conveys a secular moral and historical message. See Van Orden, 545 U.S. at 701 (Breyer, J., concurring) ("In certain contexts, a display of the tablets of the Ten Commandments can convey not simply a religious message but also a secular moral . . . [a]nd . . . historical message."); see also Pleasant Grove City v. Summum, 129 S. Ct. 1125, 1140 (2009) (Scalia, J., concurring) (engaging in a Van Orden inquiry and noting the presence of fifteen permanent displays without inquiring as to their "integration" or aesthetic quality). This display most certainly does so—after all, the monument sits with other monuments celebrating Haskell County's history and honoring (among others) those who have made the moral sacrifice of giving their lives for the rights and liberties we hold dear. The setting clearly establishes that the monument exists in a "context of history and moral ideals." Van Orden, 545 U.S. at 701 (Breyer, J., concurring).

Moreover, the message conveyed by the collection of monuments is reemphasized by the display itself, as the monument contains not only the Ten Commandments, but also the Mayflower Compact. Green, 450 F. Supp. 2d at 1276. Until the court's opinion suggested otherwise, Green, 568 F.3d at 807-08, who would have suspected that the Mayflower Compact primarily contributes to a religious message by being paired with the Ten Commandments? At the risk of stating the obvious, the Compact pertains to the founding of our country (which is of some historical significance), and nothing suggests that the Compact's religious aspects were meant to predominate. If anything, the Compact demonstrates that the historical aspect of the Ten Commandments predominated. In any event, it is clear that the monument is "part of a display that communicates not simply a religious message, but a secular message as well." Van Orden, 545 U.S. at 701 (Breyer, J., concurring).

The setting of the monument and the presence of a clear historical and moral message are "strong" indications that the monument "conveys a predominantly secular message" and is therefore constitutional. Id. at 702 (Breyer, J., concurring). It is clear, of course, that the Ten Commandments display also conveys a religious message. See id. at 690 (plurality opinion). This alone raises no concern. "Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the

Establishment Clause." Id. (plurality opinion). It is also worth noting that the County did not pay for the monument. Additionally, as in Van Orden, the government "further distance[d] . . . itself from the religious aspect of the Commandments' message," id. at 701-02 (Breyer, J., concurring), in that the monument bore the inscription "Erected by Citizens of Haskell County,"[5] Green, 450 F. Supp. 2d at 1277. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 776 (1995) (O'Connor, J., concurring) ("In context, a disclaimer helps remove doubt about state approval of [a] religious message."). This inscription, combined with the context of the display, leaves little doubt that the government itself did not communicate a predominantly religious message, but rather was merely providing space for yet another donated monument related to Haskell County's history.

B.    Heckler's Veto

In the face of these similarities, the court relies on questionable grounds to distinguish this case from Van Orden. The court emphasizes "the sharp contrast between the timing of the legal challenges" in Van Orden and this case. Green,

---

[5] The court dismisses this consideration, citing McCreary County, 545 U.S. at 871-72, because the inscription was added after litigation had begun. Green, 568 F.3d at 809. That is irrelevant. Unlike McCreary County, this notation was not a false, post-hoc rationalization; instead, it was quite true. As such, it serves to underscore the reasonable observer's view that the government did not intend to endorse religion.

568 F.3d at 806-07.  The court correctly notes that Justice Breyer relied upon the *absence* of litigation as an indication of the display's constitutionality in his <u>Van Orden</u> concurrence, <u>Van Orden</u>, 545 U.S. at 702-03, but then reasons that the *presence* of litigation demonstrates that the government's display had the effect of endorsing religion.  By treating the presence of litigation as having controlling weight, the court comes perilously close to creating a new bright-line rule: all new Ten Commandments displays are unconstitutional as long as someone is willing to exercise a heckler's veto by filing suit—and, assuredly, there will be someone.  This position is untenable.

The Supreme Court has, in a slightly different Establishment Clause context, refused to allow hecklers to exercise a veto, and we should not permit such a veto here.  See <u>Good News Club v. Milford Cent. Sch.</u>, 533 U.S. 98, 119 (2001) ("We decline to employ Establishment Clause jurisprudence using a modified heckler's veto . . . .").  According to the Court, "[a] litigant cannot, by the very act of commencing a lawsuit . . . create the appearance of divisiveness and then exploit it as evidence of entanglement." <u>Lynch</u>, 465 U.S. at 684-85.  Just as the act of commencing a lawsuit cannot provide probative evidence of entanglement, it cannot provide evidence that the government action had the effect of endorsing religion either.  The absence of litigation might suggest that there was no endorsement of religion, but a great many factors motivate lawsuits;

-9-

allowing this latter variable to act as a proxy for division of the community is neither factually nor logically warranted in every case.[6]  As the district court stated, lawsuits over Ten Commandments displays are "not so much evidence of government establishing religion as they are evidence of jurisprudence provoking litigiousness."  Green, 450 F. Supp. 2d at 1289.  Legitimizing a heckler's veto would create the peculiar result that all new Ten Commandments displays will be deemed unconstitutional, whereas old ones will (generally) be deemed constitutional.  Such a result is absolutely arbitrary and cannot be the result mandated by the Establishment Clause.

## II.    Flawed Endorsement Analysis

In addition to ignoring Van Orden, the court's endorsement analysis is wanting.  Under the Lemon test as modified by Justice O'Connor, the government violates the Establishment Clause by impermissibly endorsing religion "if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred."[7]  Bauchman v.

---

[6] This assumes, for present purposes, that divisiveness is actually a useful metric in the Establishment Clause context.  Whether it actually is useful is open to question.  See Richard W. Garnett, Religion, Division, and the First Amendment, 94 Geo. L.J. 1667 (2006).  In any event, there would have to be some sign of divisiveness other than this litigation.  See Zelman v. Simmons-Harris, 536 U.S. 639, 662 n.7 (2002).

[7] We need only consider the effect prong of the endorsement test, as the court declined to decide the case on the purpose prong.  The court was wise to do

(continued...)

West High Sch., 132 F.3d 542, 551 (10th Cir. 1997) (internal quotation marks omitted); see Lynch, 465 U.S. at 687-94 (O'Connor, J., concurring). Significantly, the endorsement inquiry is conducted from the point of view of a reasonable observer "similar to the 'reasonable person' in tort law, who is not to be identified with any ordinary individual." Capitol Square Review & Advisory Bd., 515 U.S. at 779 (O'Connor, J., concurring) (internal quotation marks omitted). "Thus, we do not ask if there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the State] endorses religion." Id. at 780 (internal quotation marks omitted) (brackets in original). Rather, we ask whether a reasonable observer undertaking an objective inquiry would conclude that the government's action had the effect of endorsing religion. See id. at 779 ("[T]he endorsement test creates a more collective standard to gauge the 'objective' meaning of the [government's] statement in the community." (internal quotation marks omitted) (brackets in original)). The panel opinion departs from

[7](...continued)
so, as we have previously concluded that the purpose inquiry "is an unworkable standard that offers no useful guidance to courts, legislators or other government actors." Bauchman v. West High Sch., 132 F.3d 542, 552 (10th Cir. 1997). The Supreme Court has also concluded that the purpose prong is rarely determinative. McCreary County, 545 U.S. at 859. Unfortunately, because the court relied almost entirely on indicators of purpose to determine the effect of the monument in this case, we also must consider matters usually reserved to the purpose prong of the endorsement test.

-11-

this objective analysis and engages in a subjective inquiry that takes all the facts in the light of an ultra-sensitive observer rather than a reasonable observer.

A. Improper Reliance on the Motivations of a Private Citizen

The court erroneously imputes the motives of a private citizen to the commissioners for the purpose of finding a government endorsement of religion, placing considerable importance on the fact that the "reasonable observer would be aware of [the private donor's] religious motivation for seeking the erection of the Monument." Green, 568 F.3d at 800. However, a truly objective inquiry would not impute a private citizen's motivations to the commissioners simply because they accepted his proposal. While the reasonable observer might have been aware that Mr. Bush had religious motivations in proposing the monument, the reasonable observer would not make the logical leap that the commissioners must therefore have shared his religious motives. Such a leap needlessly imputes a religious motive to the government, as it ignores the fact that the commissioners discussed the historic importance of the display and stated that the monument should be permitted based on the county's policy of neutrality in accepting displays. See Green, 450 F. Supp. 2d at 1275-76, 1292-94.

Moreover, the court comes perilously close to engaging in a subjective inquiry that penalizes private citizens for their religious beliefs, improperly using the Establishment Clause "as a sword to justify repression of religion [and] its

adherents from any aspect of public life." McDaniel v. Paty, 435 U.S. 618, 641

(1978) (Brennan, J., concurring). We should not be using the fact that the private

donor had an "unalloyed religious motivation," Green, 568 F.3d at 801 n.10, as

proof certain that the Establishment Clause has been violated. Sadly, we seem to

have reached the day where we construe the Establishment Clause, meant to

protect religion, so as to discourage people of faith from participating in the civic

arena. See Michael W. McConnell, Establishment and Disestablishment at the

Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2206

(2003) ("[O]ne of the principal arguments against establishment was that it was

harmful to religion. . . . Disestablishment 'advanced' religion.").

The court suggests that, while the motivation of a private citizen is

irrelevant under the purpose prong of the endorsement test, it is significant for the

effect it has on the reasonable observer's view of the monument. Green, 568 F.3d

at 801 n.10. This is a distinction without a difference. Under the purpose prong,

"we must scrutinize the *government's* intent; thus, where the challenged conduct

is the selection or display of artwork, the artist's inspiration or intent is

irrelevant." Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1031 (10th Cir.

2008). Similarly, under the effect prong, what counts is whether the reasonable

observer would conclude that the *government's* objective act has the effect of

advancing religion. Accordingly, whether a private citizen subjectively intends

-13-

that the monument have the effect of advancing religion is irrelevant to an objective effect inquiry.

## B.     Erroneous Emphasis on Community Size

The court also construes the endorsement test so as to disadvantage small communities.  The panel opinion relies on the fact that "Haskell County is a place where everyone knows each other."  Green, 568 F.3d at 801 (internal quotation marks and brackets omitted).  According to the court, Haskell County's small size means that the reasonable observer would conclude that the commissioners' statements of support for the monument "reflect a government endorsement of religion."  Id. at 802.  By reaching this conclusion, the court all but creates a presumption that small-town commissioners' statements are official statements, and having done so, treats them as indicative of an endorsement of religion.

Such reasoning leads to a completely untenable result: that the Establishment Clause means one thing in small-town America and something different in a metropolitan area.  This cannot be correct—not only from a First Amendment perspective, but also from the standpoint of announcing law that is uniform and predictable.  It is telling that the court cited no legal authority or evidence for the proposition that members of a small community are more likely to view an elected representative's statement to be official speech.  It is just as likely that a commissioner's neighbors in a small town would realize that the

commissioner was simply speaking for himself. Certainly, context is important to an Establishment Clause inquiry, see McCreary County, 545 U.S. at 866, but there is no reason in the law to create a presumption that all statements by small-town commissioners arise in their official capacity, any more than we should attribute a sectarian purpose to the commissioners' actions without proof more compelling than this case offers.

Even if the small size of Haskell County should create a presumption that all statements by county officials reflect government policy, that presumption is rebutted by the facts of this case. The court relies upon religious statements by a commissioner as well as the presence of the commissioners at a dedication ceremony and a rally for the Ten Commandments monument to demonstrate a sectarian purpose on the part of the government. Green, 568 F.3d at 801-02. However, neither the statements nor the commissioners' presence at the ceremonies should be controlling considerations.

First, while the court places great emphasis on the religious statements of the "commissioners," only one commissioner actually made religious statements. Green, 568 F.3d at 802. Further, these statements were phrased in the first person, suggesting that the statements merely reflected that commissioner's personal beliefs—which, of course, are irrelevant to our inquiry. See McCreary County, 545 U.S. at 863 ("Establishment Clause analysis does not look to the

veiled psyche of government officers."); Clayton v. Place, 884 F.2d 376, 380 (8th Cir. 1989) ("We simply do not believe elected government officials are required to check at the door whatever religious background (or lack of it) they carry with them before they act on rules that are otherwise unobjectionable."). It does not follow, then, that the personal statements of one commissioner shed any light whatsoever on the government's policy. Even assuming that one commissioner voted for the monument for religious reasons (which is by no means clear), that commissioner's statements are not probative of whether the other two commissioners voted to accept the placement of the monument in order to endorse religion. Quite simply, the purpose of the government cannot be divined from one commissioner's personal statements when there are three commissioners.[8] A truly reasonable observer would not assume otherwise.

Second, the commissioners' presence at the dedication ceremony and rally does nothing to demonstrate a sectarian effect. Commissioners can be expected to attend most any public function, especially in a small town. Attendance does not necessarily indicate endorsement; rather, it reflects what elected officials

---

[8] The court also relies on the fact that the commissioners made non-religious statements expressing their support for defending the monument in litigation. Green, 568 F.3d at 801-02. However, these statements are perfectly innocuous, and indeed can be expected of any official in relation to litigation brought against the government. That the commissioners did not immediately buckle to threats of litigation or issue disclaimers hardly suffices for proof of endorsement of religion.

-16-

do—including attending functions and representing the constituency. The reasonable observer would not conclude that the mere presence of the commissioners at the ceremonies suggests an endorsement of religion. That is why other courts confronting a similar situation have not found the mere presence of public officials at commissioning ceremonies to be particularly relevant to the endorsement inquiry. See Van Orden, 545 U.S. at 682 (plurality opinion) (two state legislators presided over dedication ceremony of Ten Commandments monument); Card v. City of Everett, 520 F.3d 1009, 1012 (9th Cir. 2008) (mayor accepted Ten Commandments monument at ceremony); cf. McCreary County, 545 U.S. at 851 (judge-executive not only attended the dedication ceremony for the Ten Commandments monument but also delivered a religious address).

While the court relies on this tenuous evidence of endorsement, it conspicuously neglects other contrary considerations. The commissioners never said that they were approving the monument for religious reasons. To the contrary, the record reflects that the commissioners discussed the historical aspect of the monument at the meeting where the monument was accepted. The county also had an informal policy regarding the erection of monuments that was perfectly neutral. Green, 450 F. Supp. 2d at 1275-76. This neutral policy warrants further mention as it, combined with the wide variety of monuments displayed at the courthouse, does much to negate any possible message of

-17-

endorsement. The fact that there were monuments for the Classes of 1954 and 1955 does not mean that the County preferred those classes over those graduating in 1957 or any other year. Nor does the presence of a monument for the Choctaw mean that the County approved of that tribe more than any other. If some other group feels lonely or neglected, they can donate a monument too under County policy. So it is with the Ten Commandments monument. These considerations dispel any notion that the display of this Ten Commandments monument violated the Establishment Clause by endorsing religion. See Capitol Square Review & Advisory Bd., 515 U.S. at 781 (O'Connor, J., concurring) (stating that a reasonable observer would know that many displays had been permitted at the park). I note that this conclusion, unlike that of the court, is consistent with the decisions reached by the other circuits that have considered Ten Commandments displays since Van Orden. This case is an outlier. See Card, 520 F.3d at 1020-21 (monument on government property); City of Plattsmouth, 419 F.3d at 776-77 (same); see also ACLU v. Mercer County, 432 F.3d 624, 636-40 (6th Cir. 2005) (display in a courthouse).

III.   Conclusion

The court has gone much further than the Supreme Court's precedent mandates in looking for that ever-pernicious "endorsement" of religion. The Establishment Clause does not require government to avoid any action that

-18-

acknowledges religion.  See Van Orden, 545 U.S. at 683-84; Lynch, 465 U.S. at 672-78.  To the contrary, "[g]overnment must inevitably take cognizance of the existence of religion," Abington Sch. Dist. v. Schempp, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring), and, I might add, its role in our history.  Accordingly, the courts must walk a delicate balance, enforcing the Establishment Clause while avoiding the "risk [of] fostering a pervasive bias or hostility to religion." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 845-46 (1995).

Here, the court failed to maintain that balance by completely eliding the fact that there is a genuine secular purpose for the display and by straining to avoid the conclusion that the primary effect of the monument was not the endorsement of religion.  It is more likely, given the facts of this case, that a reasonable observer will perceive from the razing of this monument a message of *dis*approval of religion.  At the very least, removing this monument demonstrates a "callous indifference" toward religion neither required nor permitted by the Establishment Clause.  Zorach, 343 U.S. at 314.  In sum, I fear that the breadth of the court's opinion will have far-reaching effects that tend to unnecessarily undermine communities' ability to display Ten Commandments monuments, particularly small communities.  I therefore respectfully dissent from the denial of rehearing en banc.

06-7098, *Green v. Haskell County Board of County Commissioners*

**GORSUCH**, Circuit Judge, joined by **TACHA**, **KELLY**, and **TYMKOVICH**, Circuit Judges, dissenting from the denial of rehearing en banc.


Respectfully, I believe we should have reheard this case for at least three reasons. First, by applying the *Lemon* test to a Ten Commandments display after *Van Orden*, the panel's analysis conflicts with the views of several of our sister circuits. Second, by then focusing on the perceptions of an unreasonable and mistake-prone observer, the panel's analysis conflicts with the Supreme Court's explanation of *Lemon*'s endorsement test and our sister circuits' application of it. Finally, by making us apparently the first court of appeals since *Van Orden* to strike down an inclusive display of the Ten Commandments, the panel opinion mistakes the Supreme Court's clear message that displays of the decalogue alongside other markers of our nation's legal and cultural history do not threaten an establishment of religion.

1

In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court announced a tripartite test for deciding Establishment Clause disputes. Since then, *Lemon* has been criticized by many members of the Court,[1] and a variety of legal

---

[1] *See, e.g.*, *McCreary County, Kentucky v. American Civil Liberties Union of Kentucky*, 545 U.S. 844, 890 (2005) (Scalia, J., dissenting) (collecting

(continued...)

scholars.[2]  The resulting confusion about whether and to what extent *Lemon*

continues to control Establishment Clause analysis was exacerbated by a pair of

cases handed down the same day several years ago—*McCreary County, Kentucky*

*v. American Civil Liberties Union of Kentucky*, 545 U.S. 844 (2005), and *Van*

*Orden v. Perry*, 545 U.S. 677 (2005).  In the former case, the Court held that local

government officials in Kentucky erected their display with the undeniable

*purpose* of advancing religion, in apparent violation of the first part of *Lemon*'s

multi-pronged test, *see McCreary*, 545 U.S. at 860-63, and then engaged in

---

[1](...continued)
criticisms of *Lemon* by various members of the Court); *Van Orden v. Perry*, 545
U.S. 677, 697 (2005) (Thomas, J., dissenting); *County of Allegheny v. American
Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 655-56 (1989)
(Kennedy, J., concurring in judgment in part and dissenting in part); *Corporation
of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483
U.S. 327, 346-49 (1987) (O'Connor, J., concurring in the judgment); *Wallace v.
Jaffree*, 472 U.S. 38, 112 (1985) (Rehnquist, J., dissenting); *Committee for Public
Ed. and Religious Liberty v. Regan*, 444 U.S. 646, 671 (1980) (Stevens, J.,
dissenting).

[2]  *See, e.g.*, Gerard V. Bradley, Protecting Religious Liberty: Judicial and
Legislative Responsibilities, 42 DePaul L. Rev. 253, 261 (1992); Richard W.
Garnett, Religion, Division, and the First Amendment, 94 Geo. L.J. 1667 (2006);
Douglas Laycock, Towards a General Theory of the Religion Clauses: The Case
of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev.
1373, 1380-88 (1981); Michael W. McConnell, Religious Freedom at a
Crossroads, 59 U. Chi. L. Rev. 115, 118-20 (1992) (noting the inconsistencies of
the "aptly named '*Lemon*' test"); Michael Stokes Paulsen, Lemon Is Dead, 43
Case W. Res. L. Rev. 795 (1993); Kenneth F. Ripple, The Entanglement Test of
the Religion Clauses—A Ten Year Assessment, 27 U.C.L.A. L. Rev. 1195,
1216-24 (1979); Gary J. Simson, The Establishment Clause in the Supreme Court:
Rethinking The Court's Approach, 72 Cornell L. Rev. 905 (1987).

various shenanigans designed to obscure that fact, *see id*. at 855-57, 866. By contrast, in the latter case, Justice Breyer's controlling concurrence upheld a display on the grounds of the Texas State Capitol because he concluded the monument in that case advanced the *secular* purpose of illustrating the ideals of Texans. *See Van Orden*, 545 U.S. at 702 (Breyer, J., concurring in the judgment). Neither the plurality nor Justice Breyer relied on *Lemon* to uphold the monument in *Van Orden*; indeed, they seemed to eschew it. *See id.* at 686 (plurality op.) ("Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds."); *id.* at 700 (Breyer, J., concurring in the judgment) ("I see no test-related substitute for the exercise of legal judgment.").

*McCreary* and *Van Orden*'s mixed messages have left the circuits divided over whether *Lemon* continues to control the Establishment Clause analysis of public displays. Shortly after *McCreary* and *Van Orden*, we held that *Lemon* continues to govern this domain, *O'Connor v. Washburn University*, 416 F.3d 1216, 1224 (10th Cir. 2005), and the panel in this case understandably felt obliged to follow *O'Connor*'s course. *See also Staley v. Harris County, Texas*, 461 F.3d 504, 508 n.6 (5th Cir. 2006); *Skoros v. City of New York*, 437 F.3d 1, 17 (2d Cir. 2006); *American Civil Liberties Union of Kentucky v. Mercer County,*

*Kentucky*, 432 F.3d 624, 636 (6th Cir. 2005).

But as time has marched on, a number of other circuits giving careful consideration to *Van Orden* and *McCreary* have come to a different view. These circuits have held that the "legal judgment" test Justice Breyer discussed in his *Van Orden* concurrence supplants *Lemon* at least in some areas. For example, the Ninth Circuit has held that *Van Orden* "carv[es] out an exception" from *Lemon* for displays of the decalogue. *Card v. City of Everett*, 520 F.3d 1009, 1018 (9th Cir. 2008). And the *en banc* Eighth Circuit, "[t]aking [its] cue from Chief Justice Rehnquist's opinion for the Court and Justice Breyer's concurring opinion in *Van Orden*," has said that it will "not apply the *Lemon* test" to passive displays of the Ten Commandments. *ACLU Nebraska Foundation v. City of Plattsmouth, Nebraska*, 419 F.3d 772, 778 n.8 (8th Cir. 2005) (en banc). The Fourth Circuit has reached much the same conclusion, jettisoning *Lemon* in a case concerning the voluntary recitation of the Pledge of Allegiance in public schools. *Myers v. Loudon County Public Schs.*, 418 F.3d 395, 402 (4th Cir. 2005).

We should have reheard this case to reconsider *O'Connor* in light of these more recent developments in our sister circuits. This is not to fault *O'Connor* or the panel: intermediate appellate judges seeking to identify the rule of law that governs Establishment Clause challenges to public monuments surely have their hands full after *McCreary* and *Van Orden*. At the same time, our sister circuits

-4-

have offered us much new learning since *O'Connor* and we should have taken this opportunity at least to consider it. By failing to rehear this case *en banc*, we decline the opportunity to begin aligning the circuits ourselves; as a result, at least until our superiors speak, we leave the state of the law "in Establishment Clause purgatory." *Mercer*, 432 F.3d at 636.

2

Even if *Lemon*'s test does control, the panel's opinion misconstrues it in a manner that yields another split between us and our sister courts. Until today, the premise of *Lemon*'s endorsement test was that the reasonable observer, through whose eyes an alleged endorsement is evaluated, was someone who got things right. A cousin of the "reasonable man" of tort law, the reasonable observer sees things as they really are. He is not the sort of person "'who might occasionally do unreasonable things,' but is 'rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment.'" *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 779-80 (1995) (O'Connor, J., concurring) (alteration in original) (quoting W. Page Keeton et al., Prosser & Keeton on Law of Torts 175 (5th ed. 1984)). He focuses on "the 'objective' meaning of the [government's] statement in the community," informed by the "history and context of the community and forum in which the religious display appears," as well as the "the general history of the place in which the

-5-

[religious message] is displayed." *Id.* at 779-81 (first alteration in original) (internal quotations omitted).

Employing such a reasonable person, our sister circuits that have applied *Lemon* to public displays similar to Haskell County's have upheld them. In *Mercer*, the Sixth Circuit sustained a display that included the Ten Commandments, the Bill of Rights, the Declaration of Independence, the Mayflower Compact, Magna Carta, the Star-Spangled Banner, the motto "In God We Trust," the Preamble to the Kentucky Constitution, and Lady Justice. *Mercer*, 432 F.3d at 626. The court found that these items together conveyed the "unmistakable message of the County's acknowledgment of legal history." *Id.* at 638 (internal quotation omitted). Similarly, just before *McCreary* and *Van Orden* were decided, the Seventh Circuit upheld a nearly identical display in Indiana, finding that, in such a context, the Ten Commandments were celebrated "for their historical contribution to the development of American legal and political traditions." *Books v. Elkhart County*, 401 F.3d 857, 868 (7th Cir. 2005).

The panel in our case reached the opposite conclusion because its observer is not the reasonable observer of Justice O'Connor's description, but rather an admittedly *un*reasonable one. He just gets things wrong. For example, while the reasonable observer's job under *Lemon*'s second prong is to evaluate the monument's "objective meaning of the [government's] statement in the

-6-

community," our observer spends most of his time doing something entirely different—speculating about whether the government might have secretly shared the private intent of the monument's *donor*. (And does so even after the panel holds that the display does not offend *Lemon*'s first, purpose prong. Panel Op. at 25.)

Not only does our observer do the wrong job, he does it poorly. One of his chief skills, at least according to Justice O'Connor, is the ability to distinguish between private and governmental speech. *See Pinette*, 515 U.S. at 782 (O'Connor, J., concurring) ("The reasonable observer would recognize the distinction between speech the government supports and speech that it merely allows in a place that traditionally has been open to a range of private speakers accompanied, if necessary, by an appropriate disclaimer."). Our observer is able to keep this distinction in mind for awhile: when it comes to the donor himself, our observer recognizes that Mr. Bush's comments do not represent the government's views. But he promptly forgets the distinction when he reads in the newspapers that a single county commissioner has made religious remarks, all phrased in the first person. As the panel opinion acknowledges, these statements were made in the commissioner's private capacity, and he was under no obligation to censor his personal views. Panel Op. at 34. Nevertheless, our observer *erroneously* attributes these remarks to the county government. *Id.* at 34-35.

Why does the panel's reasonable observer make such mistakes of law? It is because, the panel tells us, our observer is from a small town, where such errors cannot be helped. Even though—in contrast to denizens of Austin, Texas or Denver, Colorado—he probably knows his local government officials as friends and not as magistrates, the panel's small-town observer is somehow *less* likely to know when the official in question is speaking his own mind rather than giving an official address. The panel offers no authority or evidence in support of its sociological conjecture, yet uses it to overrule the district court's contrary factual finding.[3]

Next, our observer considers the speech of a different commissioner at the monument's unveiling, looking again for some untoward governmental purpose. This commissioner says nothing religious. Still, our observer leaps to the conclusion that, because the commissioner did not specifically *disclaim* any religious motivation, he must have shared the private donor's religious purposes.

---

[3] Like the district court, I would have thought that, if anything, Haskell County's size cuts in the opposite direction. I would have expected that, in small communities, people may already know a public official's private opinions and often realize their friends and acquaintances are speaking for themselves ("There goes Johnny again spouting off...."). By contrast, if a city councilman in New York is quoted in the local paper, the only thing most readers are likely to know about her *is* that she is a government official. At the very least, I see no reason based in law or the record to prefer the one or the other guess about the import of Haskell County's size to the reasonable observer's perception about a single commissioner's two brief statements to the media.

Panel Op. at 35.  This even though the commissioner *never* endorsed the private

donor's religious statements.  And even though the county's display *itself*

supplied an indication of its secular meaning by including the decalogue not just

in a larger display celebrating cultural and historical influences but also on a

stone bearing an inscription of another important piece of our legal tradition, the

Mayflower Compact.

Mistake piles on mistake as our observer suspects that the government

harbors some nefarious intent because it refused to raze the monument when this

lawsuit was threatened.  Hearing that some lawyers have presented some "clearly

voiced Establishment Clause concerns," Panel Op. at 36-37, our observer does not

pause to evaluate whether these concerns are meritorious, or wait for the

resolution of the litigation.  Instead, he assumes that when local governments say

they intend to defend a lawsuit and leave the monument standing unless ordered

to do otherwise, that indicates an endorsement of religion.

Finally, our observer is something of an art critic.  He complains that the

Haskell County's courthouse lawn display does not have "a unifying, cohesive

secular theme," resemble a "unified exhibit in a 'typical museum setting,'" or at

least appear to be "associated with intellectual experimentation."  Panel Op. at

40-41 & n.16.  But here, too, our observer is mistaken.  The display *does* have a

unifying theme:  it memorializes and celebrates people and ideals important to

Haskell County. Our observer's real problem seems to be with the lack of any central planning behind the courthouse display. He would have felt better if someone in county government had sat down and made a list of those things important to people in Haskell County, and then commissioned thematically consistent monuments reflecting the items on the list. Haskell County's mistake was to leave it up to the people of the county to determine the content of its "mélange," Panel Op. at 39, by allowing them to donate monuments of their choosing.

One can't help but ask wonder other familiar public memorials would fail our observer's aesthetic standards. What is, say, the unifying theme behind the Congress's collection of monuments in Statuary Hall, which includes likenesses of George Washington (Virginia), Brigham Young (Utah), and Father Junipero Serra (California)? It is only that the Congress has invited the States to donate two monuments of their choosing. These individuals, some of whom were religious figures, are commemorated only because they are important to the people of the States; the lack of any *other* unifying theme hardly renders it difficult to understand the secular importance of the latter two men.

Exactly the same should hold true here. Rather than focusing on the aesthetic qualities of Haskell County's display, it should be enough that there is no indication that county officials had any sort of policy by which they

discriminated among proposed monuments based on the message they communicate. The history of the courthouse lawn suggests the county approved most any donated monument that had some connection to the history and people of Haskell County. If the class of 1955 wanted to donate a bench, so be it; as Judge Kelly indicates, it doesn't mean the county dislikes the class of 1956. If the Choctaw Nation wanted a commemorative monument, so be it; there's no indication other Indian nations can't also donate one. And if a group wanted a monument with the decalogue and Mayflower Compact, the natural inference is that county government thought, 'so be it.'

What the majority calls "the very significant magnitude of the evidence indicating an impermissible endorsement," Panel Op. 47, consists of the facts I have just recounted: the private donor's intent, the statements of a single commissioner in his concededly private capacity, the county's refusal to buckle to litigation pressure, and the county's perceived lack of artistic taste. None of this, of course, is evidence that the Constitution was violated. But to our observer, apparently it can be *mistaken* for such evidence. And the only thing keeping the veil over our observer's eyes is the novel view that in "the context of the small community of Haskell County," reasonable observers make unreasonable mistakes. Panel Op. at 47, *see also id.* at 32, 35. The result is not simply a misapplication of the reasonable observer test: it is a rewriting of that test in a

manner inconsistent with our sister circuits' application of it.

3

Whatever test we are supposed to apply, or the number of its prongs, the Supreme Court's central message in *McCreary* and *Van Orden* was that public displays focusing on the ideals and history of a locality do not run afoul of the Establishment Clause just because they include the Ten Commandments.  The panel's decision denies the precedential force of this holding and makes us the first circuit court since *McCreary* and *Van Orden* to strike down such an inclusive display.

While problems may arise when the Ten Commandments are displayed alone, or as part of a patent attempt to advance a religious message, *McCreary*, 545 U.S. at 867; *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), the Supreme Court has made clear that the decalogue's influence isn't just religious.  In inclusive displays on places like courthouse lawns, the Ten Commandments can convey a "secular moral message" about the primacy and authority of law, as well as the "history and moral ideals" of our society and legal tradition.  *Van Orden*, 545 U.S. at 701-02 (Breyer, J., concurring in the judgment).  Neither is this surprising.  Though their influence may be indirect, it is "undeniable" that "the Ten Commandments have had a significant impact on the development of secular legal codes of the Western World."  *Stone*, 449 U.S. at 45 (Rehnquist, J.,

-12-

dissenting); *see also Edwards v. Aguillard*, 482 U.S. 578, 594 (1987) (rejecting the suggestion that "the Ten Commandments played an exclusively religious role in the history of Western Civilization"); *State v. Freedom from Religion Foundation, Inc.*, 898 P.2d 1013, 1024 (Colo. 1995) (noting that "at least to the extent that the Commandments established ethical or moral principles, they were expressions of universal standards" of conduct later embodied in law). And quite apart from their content, Moses' tablets have become an archetypal symbol for law itself, what other courts have called "a secular symbol for the rule of law." *King v. Richmond County, Georgia*, 331 F.3d 1271, 1277 (11th Cir. 2003).[4]

---

[4] Each House of Congress apparently agrees, having passed concurrent resolutions in 1997 affirming that "the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization"; that they "set forth a code of moral conduct, observance of which is universally acknowledged to promote respect for our system of laws and the good of society"; and that they "are a declaration of fundamental principles that are the cornerstone of a fair and just society." Brief of the United States as Amicus Curiae Supporting Respondents at 9, *Van Orden v. Perry*, 545 U.S. 677 (citing S. Con. Res. 13, 105th Cong., 1st Sess. (1997); H.R. Con. Res. 31, 105th Cong., 1st Sess. (1997)). As President John Quincy Adams put it, "[t]he law given from Sinai was a civil and municipal as well as a moral and religious code; it contained many statutes . . . of universal application—laws essential to the existence of men in society, and most of which have been enacted by every nation which ever professed any code of laws." *Id.* (quoting *Letters of John Quincy Adams, to His Son, on the Bible and its Teachings* 61 (James M. Alden ed., 1850)). Even in *Stone*, while invalidating a state law requiring that the Ten Commandments be posted by themselves in public school classrooms, the Court took pains to emphasize that they may be "integrated into . . . the school curriculum . . . in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone*, 449 U.S. at 42.

For just such reasons, we are long accustomed to seeing the decalogue—sometimes alongside the Mayflower Compact, the Magna Carta, or the Declaration of Independence—in and around courthouses and other public buildings associated with the administration of law. The Ten Commandments appear in displays at the State Capitol and in front of a city hall in Colorado, in front of a Kansas municipal building, before a county courthouse in New Mexico, and in public parks in Utah and Wyoming—just to mention some examples in our own circuit. Our Nation's capital practically abounds with the Commandments: at the Library of Congress, outside the (relatively new) Ronald Reagan International Trade Building, at the National Archives, inside and outside the Supreme Court building and even on its doors. *See generally Van Orden*, 545 U.S. at 688-89 (plurality opinion) (providing examples). The upshot of *McCreary* and *Van Orden* is that this reality does not violate the First Amendment.

While I would prefer to rehear this case to determine whether and how *Lemon* applies, the fact remains that regardless of all this the panel's opinion is simply inconsistent with the most analogous decision of the Supreme Court. Even if we can't be sure anymore what legal rule controls Establishment Clause analysis in these cases, we should all be able to agree at least that cases like *Van Orden* should come out like *Van Orden*. If this seems facile, that's because it is. But the most elemental dictate of legal reasoning always has been and remains:

-14-

like cases should be treated alike. Whatever else might be said, if an inclusive display where the decalogue makes an appearance was acceptable to the Supreme Court in *Van Orden*, similar displays should be acceptable to us.

I respectfully dissent from the denial of rehearing *en banc*.